OSCAR Roos, Register of Deeds of Chisago County, Appellant, *vs.* THE STATE OF MINNESOTA, *ex rel.* ANDREW SWENSON, Respondent.

### APPEAL FROM THE DISTRICT COURT OF CHISAGO COUNTY.

The Act of March 18, 1858, *Stat. of Minn. p.* 111–12, providing the manner in which the county seat of a county may be changed, is unconstitutional, and in conflict with *Art.* 11, *Sec.* 1, *of the State Constitution.* The Legislature must in every case of a change of county lines in counties already organized, or for removing a county seat, pass a special act to take effect upon its adoption by the electors of the county, &c., at the next general election after its passage.

*Atwater, J., dissents.*

The following is the writ of mandamus issued in this cause:
The State of Minnesota:

To Oscar Roos, Register of Deeds of said County of Chisago, greeting: The Plaintiff in this proceeding, Andrew Swenson, citizen, resident, householder, and legal voter of said county of Chisago, has filed with us his certain affidavit in this behalf made, and our said District Court has been pleased thereupon to grant this our high prerogative writ of mandamus. And true it is,—

That the said Andrew Swenson is, and for a long time has been, a citizen, resident, householder and legal voter of said county of Chisago and State of Minnesota.

That on or about the 5th day of September, 1860, at said county of Chisago, and more than thirty days previous to the next ensuing election to be held in the said county of Chisago, a petition in writing duly addressed to the Board of County Commissioners of Chisago county, Minnesota, was then and there presented and delivered to said commissioners; said petition being duly signed and subscribed by a number of the citizens and legal voters of said county, equal in number to one-half of the highest number of votes cast at the general election held in said county next preceding said 5th day of September, 1860. The prayer in said petition contained was

in substance as follows, to wit: That the citizens and legal voters of said county of Chisago at the next ensuing general election to be held in said county on the 6th day of November, 1860, might be allowed to vote on the removal of the county seat of said county of Chisago from Taylor's Falls to Center City, in said county of Chisago.

That the number of said citizens and legal voters whose names were subscribed to said petition, and who signed the same, was 235, and that the whole number of votes cast in said county of Chisago at the general election held therein on the 11th day of August, 1859, was 432.

That the said petition was signed by a larger number of petitioners than any other petition presented to said commissioners asking to be allowed to vote on the removal of the said county seat at said election.

That no vote was taken at the said general election to remove said county seat to any other point.

That no vote was taken at the last preceding election held in said county before that time to remove the said county seat to said Center City.

That no vote had been taken at any election held in said county within three years next preceding the said election held on the 6th day of November, 1860, to remove said county seat.

That said county seat had been located at Taylor's Falls more than three years next preceding the said election held on the said 6th day of November, 1860.

That no vote for relocating or removing the said county seat had been taken for more than three years next preceding said 6th day of November, 1860.

That afterward, and in compliance with the said prayer of said petitioners in said petition contained, the said commissioners duly caused to be inserted in the notices of the said general election to be held on the 6th day of November, in said county, an article requiring the voters of said county to vote on the removal of the said county seat from Taylor's Falls to the said Center City.

That on the said 6th day of November, 1860, at the several polls and places of voting in said county, the citizens and

legal voters thereof did then and there, in due form of law and in pursuance of the notices aforesaid, vote upon the removal of said county seat to said Center City.

That on the 9th day of November, 1860, at the said county of Chisago, the said votes cast upon the removal of the said county seat as aforesaid, were duly canvassed by the canvassing board duly qualified to perform the duty of canvassing the same. Whereupon it was by the said canvassing board found, and by the said board then and there duly declared, that a majority of all the legal votes cast at said election in said county was in favor of the removal of said county seat from Taylor's Falls to the said Center City, which said vote as found and declared by said board being as follows, to-wit: In favor of removal, 246 votes, and against removal, 201 votes.

That on and prior to the first day of November, 1860, you, the said Oscar Roos, were, and ever since have been, and now are the Register of Deeds of said county of Chisago, duly elected, qualified and acting as such.

That you, the said Oscar Roos, Register of Deeds as aforesaid, from and ever since the 29th day of November, 1860, and contrary to the statutes in such case made and provided, have kept, and still do keep and hold your office aforesaid, together with all the books, papers, and records belonging to your said office at Taylor's Falls in said county of Chisago, as the county seat thereof.

That you, the said Oscar Roos, Register of Deeds aforesaid, in violation and neglect of your duty in that behalf, and contrary to the statutes in such case made and provided, have hitherto wholly neglected and still do neglect to remove your said office to the said Center City, and there keep and hold the same as the county seat of said county of Chisago.

That the said Andrew Swenson did, on or about the 2d day of December, 1860, at the town of Taylor's Falls in said county, make demand of and request you, the said Oscar Roos, that you forthwith remove your said office from said Taylor's Falls to said Center City, and there hold the same as the county seat of said county of Chisago.

And that said Andrew Swenson has no adequate remedy in the ordinary course of the law.

Now therefore, you, the said Oscar Roos, Register of Deeds of said county of Chisago as aforesaid, are hereby commanded that immediately after the receipt of this writ you do remove your said office to the said Center City in said county of Chisago, and that you there keep and hold the same as the county seat of your said county of Chisago, in pursuance of the statutes in such case made and provided, or that you show cause before our District Court of the First Judicial District of the county of Chisago, at the court house thereof, on the 15th day of October, 1861, at 10 o'clock in the forenoon of that day, why you have not done so, and do you then and there return this writ with your certificate of having done as you are herein commanded.

Hereof fail not, &c., &c.

The following is the answer to the writ :

And now before the Court here comes the Defendant Oscar Roos, and here brings and returns the writ of mandamus served on him in this proceeding, and for answer to the said writ and for cause unto your Honor showing why he hath not done as in the said writ he is commanded to do, the Defendant alleges, states, and declares,

That on the 5th day of September, 1860, there was not, and since that day there has not been any law of this State in force authorizing or providing for the removal of the county seat of said county from the town of Taylor's Falls in said county, to Center City in said county, or elsewhere.

That the writ in this case does not state any facts showing that under the laws of this State the said town of Taylor's Falls is not the county seat of said county, or that it is the duty of this Defendant to remove his said office and keep the same at said Center City.

That the statutes of this State, on *pages* 111–12 *of the General Statutes*, relative to the removal of county seats, is unconstitutional, in conflict with the constitution of this State, and void.

That the aforesaid statute has never been submitted to the electors of said county for their ratification or approval, and that for that reason the said statute is void and of no effect.

And that under the laws of this State in force before and

since the first day of September, 1860, the said town of Taylor's Falls was and ever since has been and still is the county seat of said county.

That the aforesaid statute, on *pages* 111–12 *of the General Statutes*, was not at the next general election after the passage thereof, submitted to the electors of said county, and that the said statute has not, since the passage thereof, been adopted by a majority of the electors of said county.

Upon the hearing before the Judge it was ordered that the return to the writ of mandamus be quashed unless the Defendant amend the return thereto.

Defendant declined to amend, whereupon it was ordered that the writ of mandamus be made peremptory.

Points and Authorities for Appellant.

I.—The Defendant could not demur to the writ. *Stat.*, 633, *sec.* 11. And as the Defendant could not demur to the writ, he might by his return, submit that he was not bound by law to execute it, which submission being in the nature of a demurrer, should have been treated accordingly; that is, the point should have been argued and decided upon the sufficiency of the writ. *Tapping on Mandamus*, 404, (362).

II.—The writ of mandamus must clearly show upon its face, that it is the Defendant's duty to execute it. *Tapping on Mandamus*, 367, (322); while in this proceeding the writ did not state facts sufficient to show that by law it was the Defendant's duty to execute it.

III.—The return was sufficient and the Court erred in quashing it; and whether sufficient or not, the writ itself was defective in substance, and did not state facts sufficient to entitle the Plaintiff to a peremptory writ, even upon default. When a complaint does not state facts sufficient to constitute a cause of action, a judgment upon default will be reversed by the Supreme Court. *Tapping on Mandamus*, 355, (308), to 481, (382).

Points and Authorities for Respondent.

I.—The writ is sufficient, and shows clearly upon its face

that it was the duty of the Defendant to obey it.   *Compiled Statutes*, 111–12.

II.—The Defendant, by his answer to the merits, waived all defects in form, and irregularities in the writ.

III.—The Defendant, by his answer, admits the existence of the law upon the statutes, and also the regularity and sufficiency of the proceedings had under the law, as the same is alleged in the writ, the effect of which he seeks to avoid by denying the constitutionality of said law, thereby placing himself in the attitude of disobeying the laws and defying the authority of the Court by setting up his individual opinion and construction of the law, which, if permitted to do, would be subversive of all law and of the power and authority of the Court.

IV.—The Defendant has by his answer placed on record the fact that the law in question is in existence upon the statutes, and is thereby estopped to deny his duty to obey the writ. *Gould's Pleadings*, *p.* 153, *sec.* 168.


W. H. Burt, Counsel for Appellant.


L. R. Cornman, Counsel for Respondent.


*By the Court*—Flandrau, J.—The question presented by this appeal is one of very considerable importance to the State at large, and has enlisted our earnest endeavors to arrive at a correct determination.   We have viewed it in all its legitimate bearings, and applied such rules of interpretation to the provision of the Constitution involved, as are sanctioned by law and judicial decision, with a desire on our part to sustain the act of the legislature brought into question, if possible, without doing violence to the organic law.

Previous to the adoption of our Constitution, the legislative power of the Territory was vested in the Governor and the Legislative Assembly.   *Organic Act*, *sec.* 4.   And no law could be passed by any other authority.   In the year 1853, a law was passed by the legislature of the Territory, on the subject of the manufacture and traffic in spirituous liquors, the validity of which was left to be determined by a vote of the

people. *Laws* 1853, *pp.* 7-13, *sec.* 19. The people in their primary assemblies adopted or ratified the law by a majority vote, and the courts of the Territory subsequently declared it void, as having been in effect passed by the people and not the legislature. I am unable, however, to find any record or report of the decision, and am not certain that the question was passed upon by the court of last resort. The rule is a familiar one, however, and has received the sanction of the courts of other States. *Parker vs. The Commonwealth*, 6 *Barr. Rep.* 515-16.

During the Territorial existence of Minnesota, a very great evil had grown up in the legislation of the country, consequent upon the feverish excitement that prevailed for the creation of towns and cities, and the speculation in lots and lands. It was the constant practice of the legislature to change county lines, and the county seats of counties from one town to another, at the solicitation of interested parties, without a full understanding of the wishes and interests of the people of the counties affected. Instances even occurred where such removals were carried through the legislature without the knowledge of that body, by inserting clauses in bills, surreptitiously, the title of which indicated entirely another purpose. As long as the power to change county lines, and remove county seats resided in the legislature alone, and its authority was unrestricted, it was found that its action on the subject was liable to abuse.

When the Constitution was framed this subject received the careful consideration of the Convention, and the discussion upon what is now *section 1 of article* 11 of the Constitution was based almost entirely upon the abuses that had previously existed in the legislation of the Territory, and it was the almost universally expressed opinion of the members, that some check should be imposed upon the legislature in regard to making changes in county lines and county seats ; and it was decided that the most just and practicable method would be to require the sanction of the citizens of the counties to be affected, to the legislation, before it could become operative. See the Debates of the Convention presided over by President Sibley, from page 467 to 480 ; also those of the Convention

presided over by President Balcombe, from page 259 to 269.

The result of these debates was the following section of the Constitution.   *Art.* 11, *sec.* 1 :

"·The legislature may, from time to time, establish and organize new counties, but no new county shall contain less than four hundred square miles; nor shall any county be reduced below that amount; and all laws changing county lines in counties already organized, or for removing county seats, shall, before taking effect, be submitted to the electors of the county or counties to be affected thereby, at the next general election after the passage thereof, and be adopted by a majority of . such electors.   Counties now established may be enlarged, but not reduced below four hundred square miles."

The legislature, at the session of 1858, passed a general law for the removal of county seats, (*Stats. Compd. ed. p.* 111,) by which it is provided that when a number of voters in a county, equal to half the highest number of votes polled at the general election preceding, shall petition the County Commissioners for a change of the county seat, the Commissioners shall submit the question of change to the electors, &c., and a majority voting in favor of the change shall effect it, &c.   This act was designed to remain in force and apply to all future cases.   Now, it will be seen that by the provisions of this law, the legislature does not act directly upon the question of the change of any particular county seat at all, but the whole question is left to the people of each county, and the county seat may be removed and the legislature know nothing about it.

Let us see whether the Constitution intended to work any such change as the legislature has introduced.   In the first place, there was no way, as we have shown, to obtain the voice of the people, directly, upon any subject of legislation, as long as the legislative power was vested solely in the legislature.   That body was not permitted to delegate its trust to the people, or any one else.   It became necessary, therefore, in order that the people might have a voice directly in any subject, properly one of legislative cognizance, that some provision should be made for it in the Constitution.   All other

subjects of legislative jurisdiction are conferred upon that body, without qualification. *Art.* 4 *Const.* But the people were not willing to allow the legislature absolute control over the question of county lines, in counties that were " already organized," nor over the removal of county seats, as had previously been the case, and as would have yet been so, had nothing been said in the Constitution about it; because under our system of government, State constitutions are not creative, but restrictive instruments, and the legislature of a State has as extensive powers as the Parliament of Great Britain, subject only to the restrictions imposed upon it by the Constitution of the United States, and the particular state in which it acts. *Board of Supervisors of Ramsey Co. v. Heenan,* 2 *Minn. R.* 330-2. The purpose of the Constitution was to impose a restriction upon the legislature, in acting upon a certain class of subjects. It was not to deprive that body of any participation in them whatever, and confer the jurisdiction upon some distinct tribunal. It was more in the nature of granting to the people of the several counties a veto power upon its acts, than of conferring the power in the first instance upon the people. The words are " all laws changing county lines," &c., " or for removing county seats," which must be read " or all laws for removing county seats," " shall before taking effect, be submitted," &c., " at the next general election after the passage thereof, and be adopted," &c.

It takes a law to change a county seat or a county line now, just as it did before the Constitution was adopted, and the people have no more power to originate laws now than they ever had, nor does the Constitution, in this particular instance, confer upon the people any power whatever over, or participation in, the passage of these laws. The law must be passed by the legislature making the change in the line, or the county seat, just as formerly ; and it is as perfect a law as any other when it leaves the hands of that body. It is, however, made to take effect upon the happening of a certain contingency, which contingency is an approbatory vote of the people. The law, upon the happening of the event upon which its effect depends, at once becomes operative *proprio vigore.* It was as much a law prior to the vote of the people as sub-

sequent to that event, its operative force being suspended merely; its vitality being dormant.   It is precisely the same case as the passage of a law by the legislature, made to take effect upon the happening of any other event, such as a future day, which is the most usual case.   The law is passed, and the legislature declare that it shall take effect and be in force from and after some future day; or after it shall have received a certain notoriety by a given number of publications in a newspaper.   Or suppose the legislature to anticipate a declaration of war by some foreign power.   It passes a military bill, calling into action a vigorous militia system, incompatible with a peace establishment, but necessary as a war measure.   The law is made to take effect upon the contingency of war being declared.   If war is declared, the law at once becomes operative, not by the act of the foreign government in declaring war, because that can have no influence upon the legislation of our State, but by the vital force infused into the law by the legislature at the time of its passage, which force is confined and quiescent until called into life by the happening of the event upon which it is made to depend.   Such laws (if I can be permitted a figure of the times) may be assimilated to shells, or other military projectiles, which contain within themselves all the forces necessary for the complete fulfilment of their purpose, but whose energies are latent, suspended, and remain at rest until the application of the match.   The event may never transpire, nor the match be applied, yet they are none the less perfect of their kind when they leave the hands of the artisan.

We do not think the framers of the Constitution meditated any such change as the legislature has adopted.   They did not mean that a county seat should be changed without the sanction of the legislature, any more than that a county line should be subject to alteration, solely at the will of the inhabitants of the county.   They only intended to prevent the legislature from making laws of this peculiar nature, contrary to the desires and interests of the people of the locality.   They have not said to the legislature—you shall change a county seat whenever the people, or a majority of them, shall desire it: but merely that you shall not make such change unless

they do approve your action. The legislature still possesses full power over the subject, in one sense, because no change can be made without that body originating the measure and sanctioning it by the passage of an act.

The counsel for the Defendant in this case insists that the State at large have an interest in the location of county seats, as well as the local inhabitants of the county. The position is certainly true when considered either with reference to the subject matter involved, or philosophically, as a matter of governmental policy. The county seat is the point at which public justice is administered, and in this respect may, and constantly does, affect the rights and interests of citizens from all parts of the State, as suitors, witnesses and otherwise. It is also the depository of all county records, involving taxes, titles, and other matters of general public interest ; and in this view cannot be regarded as entirely a local matter. On the other hand experience has proven beyond doubt, that the most irresponsible and dangerous of all tribunals to invest with legislative powers, is the people in their primary action at the ballot-box. They have seldom failed to burthen themselves with crushing debts for the most fantastic and speculative purposes, whenever the power has been confided to them. The history of our western cities, counties and towns, for the past ten years, is a standing monument of their willingness to run into all kinds of excesses, in the hope of temporary relief from pressing embarrassments, generally ending in serious distress and permanent detriment to whole communities ; sometimes in discreditable repudiations. It may be said that such matters concern themselves and they are the best judges. Such, however, is a very unwise and unstatesmanlike view of the subject, and has a tendency to subvert the advantages of a representative, and restore all the evils of a pure democracy, to our system of government. The Constitution should be very explicit in inaugurating changes of this character, to justify the courts in giving such effect to its provisions. This case is disembarrassed, however, of all real difficulties, as the words of the Constitution do not admit of any just construction that will allow the legislature to confer the power in these cases entirely upon the people. The legislature must,

in every case of a change of county lines in counties " already organized," or for removing a county seat, pass a special act, to take effect upon its adoption by the electors of the county, &c., at the next general election after its passage.    The act of March 18, 1858 (*Comp. Stats.* 111-12) is in conflict with both the spirit and letter of the Constitution, and of no force.

The counsel for the relator insists, however, that the Defendant is estopped from calling into question the validity of the act, because he had referred to it in his answer or return to the writ of mandamus, as an act of. the legislature, or law, and cannot now allege that it is not such ; in other words, that he has adopted it.    We cannot see the force of this position. It would be difficult for the Defendant to make his point upon the validity of the supposed law, unless he could call the attention of the Court to it by reference to its title, or its place in the statute book ; and further, we do not think it is a matter in which the Defendant could estop himself by any act of adoption.    If the law is void, he may raise the question here or anywhere else, on the trial, or in arrest of judgment.

The order or judgment making the writ of mandamus peremptory, is reversed.

ATWATER, J, filed the following dissenting opinion :

The evil which had grown up under our Territorial organization, with regard to changing county-lines, and removing county seats, has been correctly stated by my brother Flandrau, but I cannot agree with my associates in holding that the law of 1858, above referred to, is unconstitutional.    It will be observed that the only objection urged to that statute is, that it is in conflict with *section* 1 *of article* 11, *of the Constitution*.    That the subject matter of the act of March 18, 1858, (*chap.* 2, *p.* 111, *Comp. Stat.*,) is within the scope of legislative action, (unless restricted by the organic law,) is conceded.    And if so, then the Legislature had the same authority to pass a general act, regulating the removal of county seats, that it had to enact a special law providing for the removal of a particular county seat.    And so too, is it within the scope of legitimate legislative action, that without interfering directly as a legislative body in the removal of county seats, it should provide the means whereby the people of each

county may locate their county seat, without any interference by the Legislature in the matter. In other words there is nothing in the nature of the case, or of the subject matter, that renders it necessary, or even appropriate, that the legislature should interfere directly in the removal of county seats.

On the contrary, the very evil which had grown up under legislative action on this subject, proves conclusively the propriety of removing the subject as far as possible, from legislative interference. And this unquestionably was the object, both of the provision in the constitution, and of the statute of 1858, only the latter has attained the object more completely than the former. And although previous to the adoption of the constitution the legislature had the power, and had often exercised it, of changing county seats, without regard to the wishes of the inhabitants of the county, yet the power itself is opposed to the whole theory of our republican form of government, which is, that of self government for each state and municipality—the absolute right of managing its local concerns, without interference from strangers. This principle is violated in every interference by the legislature in the removal of a county seat contrary to the wishes of the people of a county. No sound reason can be given why the people of a county have not, and should not have the right and privilege of locating their seat of government without interference by the people of other sections of the State.

It is said that the people of the State at large have an interest in the location of the respective county seats. It is true they have what may be termed an indirect interest in the question, but not such an one as takes the case out of the application of the principle above referred to. The people of the State have an interest in having competent and efficient county officers elected in each county, in having good roads maintained, in the moral and intellectual training of the people, and in numerous other matters which might be named, but all of which are left for the citizens of each county to manage for themselves, and any interference in which, by the inhabitants of other sections of the State, would justly be regarded as an infringement upon their rights, which would not for a moment be tolerated.

Nor will it do for the judicial tribunals to take away these rights on the ground that the people are incompetent to exercise them. Our only business is to declare and interpret the law, and not to limit, or render it inoperative, from fear that the people may not wisely exercise their rights under it. Whatever differences of opinion may exist as to the policy of allowing the people the right of self-government, or as to the extent to which the right should be allowed, the question cannot properly be here discussed, nor the law administered with reference to our own views of what is right and proper.

Let us now examine the law of 1858, and see whether it is in conflict with *sec. 1 of art. 11 of the Constitution.* Unless it is, it is admitted that it must be sustained. There is no provision in that act for submitting the same to the people for ratification, and from the nature of the case there is no necessity for such submission. For it is not an act providing for the removal of any county seat, but only providing a general mode in which the people of a county may proceed to change or locate a county seat. Now the constitution contains no prohibition of legislation of this nature. The legislature may now, as before, enact a law changing a county seat. But if it does so, the law before taking effect, shall be submitted to the electors of the county to be affected thereby, &c. It is an entire mistake to suppose that this provision of the constitution requires a special act to change or locate a county seat. Neither the language or spirit of that instrument, in my judgment, can receive such a construction. And the evil which it is admitted the constitution only aimed to remedy, is even more effectually prevented by the act, than it would have been under the law as it formerly existed, with the restriction imposed by the organic law. For if it be true that the constitution is intended to forbid the removal of county seats, except by special act of the legislature, that body must still be subject to all the corrupt influences which were formerly brought to bear in favor of or against the removal or establishment of a county seat. It is true the people of a county are not, as before, left entirely in the power of the legislature, to suffer the evil consequences of such cor-

rupt legislation, and for that reason the motive for it may to some extent be diminished. But still it would exist, and from the nature of the case, these corrupt influences would be brought to bear in almost every contested case of location or change of a county seat. The act of 1858 strikes at the very root of the evil. It takes the matter out of the hands of the legislature, and places it in the hands of the people of the county to be affected by it, where it properly belongs. And while it effectually bars one pregnant source of evil, it is in entire harmony with the whole theory and practice of municipal government in this country, in accordance with reason, justice, and the spirit of the organic law, and not repugnant to its letter, and I see no tenable ground on which it can be set aside.

That an act of the legislature cannot be set aside as unconstitutional, unless its incompatibility with the constitution is clear and unequivocal, is an elementary principle, recognized by authorities so numerous that it is unnecessary to quote them. I think this principle is violated in holding the act in question unconstitutional. This must be so, unless the constitution requires a special act to change or locate a county seat. It does not in terms so require, nor in my judgment can it have such meaning by any fair construction. The legislature having still the power to locate or remove county seats, whenever such power is exercised, the constitution only requires that the law be submitted to the people before taking effect. It is at best only by doubtful implication, that it can be said that the constitution designed to take from the legislature the power, which it formerly enjoyed beyond question, of passing an act of this kind. And by another equally well settled rule of construction, clauses in the organic law, restrictive of rights before enjoyed, must be strictly construed, and cannot be extended by implication to embrace more than is covered by the exact terms of the instrument. With how much more force does the rule apply to a case like the present, when the effect of giving an extended meaning to the clause is to nullify a law, which completely remedies the evil aimed at by the framers of the constitution, and secures to the peo-

ple the exercise of a right which is in entire accordance with the system of municipal government which prevails in this country. For these reasons therefore, I think the order of the District Court should be affirmed.