**REPUBLICAN PARTY OF ARKANSAS; Faulkner County Republican Committee, Plaintiffs–Appellants,**

v.

**FAULKNER COUNTY, ARKANSAS; Faulkner County Election Commission, Defendants–Appellees,**

**Association of Arkansas Counties; State of Arkansas, Intervenors–Appellees.**

**No. 94–1684.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 15, 1994.

Decided March 2, 1995.

John Wesley Hall, Jr., Little Rock, AR, argued (Scott E. Daniel, on the brief), for appellants.

Angela S. Jegley, Little Rock, AR, argued, for State of Arkansas.

Robert A. Russell, Little Rock, AR, argued (Marcus Vaden, on the brief), for the Ass'n of Arkansas Counties.

Before FAGG, Circuit Judge; HEANEY, Senior Circuit Judge; and LOKEN, Circuit Judge.

HEANEY, Senior Circuit Judge.

In this appeal, the Republican Party of Arkansas challenges the constitutionality of Arkansas's requirements that political parties both conduct and pay for primary elections as a condition of access to the general election ballot. Because we find that the combined effect of these requirements impermissibly burdens the First and Fourteenth Amendment associational rights of voters and of the Republican Party, we hold them to be unconstitutional.

We emphasize at the outset that our decision today is limited in scope: we hold neither that the state of Arkansas is constitutionally required to fund primary elections, nor that Arkansas must drop its mandatory party primary. Rather, we find that the burdens placed on voters and parties by the interaction of the two requirements render the provisions unconstitutional in combination. Because parties must bear the costs of conducting primary elections, the availability of party polling places depends upon the ability of the local party organizations to attract sufficient contributions. The resulting disparity in the provision of polling places means that many voters are effectively prevented from voting in the Republican primary and, hence, from participating in an integral component of the electoral process. Our judgment is thus declaratory in nature; we leave to the Arkansas legislature the task of modifying its election code to bring it into conformity with the Constitution.

I.  Constitutional Background

While the legal claim advanced by the Republican Party of Arkansas against Faulkner County, the Faulkner County Election Commission and the State of Arkansas [1] does not fit neatly within any one of the conven-

---

1.  The state of Arkansas intervened in this case below to defend the constitutionality of its statutes. The Association of Arkansas Counties intervened to protect the financial and other interests of its members. Because the constitutional arguments advanced by the state, Faulkner County, the Election Commission and the Association are identical, we refer to the defendants collectively as "Arkansas" or "the state."

tional lines of constitutional analysis of election laws, those lines nevertheless supply the doctrinal background against which the Republican Party's claims must be evaluated.

■■■ The rights of political parties flow primarily from two constitutional sources: the right of association protected by the First and Fourteenth Amendments, and the Equal Protection Clause of the Fourteenth Amendment. The right to associate is a penumbral right not expressly granted by the Constitution, but implied through the First Amendment rights to speech, petition and assembly. *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Moreover, "[i]t is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *Id.* at 460, 78 S.Ct. at 1171. In *Elrod v. Burns,* 427 U.S. 347, 356, 96 S.Ct. 2673, 2681, 49 L.Ed.2d 547 (1976), a plurality of the Supreme Court noted that "political belief and association constitute the core of those activities protected by the First Amendment." Elsewhere the Court has stated:

> [F]reedom to associate with others for the common advancement of political beliefs and ideas is a form of "orderly group activity" protected by the First and Fourteenth Amendments. The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom.

*Kusper v. Pontikes,* 414 U.S. 51, 57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973) (citations omitted). "The freedom of association protected by the First and Fourteenth Amendments includes partisan political organization." *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 214, 107 S.Ct. 544, 548, 93 L.Ed.2d 514 (1986). The rights of political parties are derivative of and coextensive with the associational rights of their members. Thus, " '[a]ny interference with the freedom of a party is simultaneously an interference with the freedom of its adherents.' " *Democratic Party of United States v. Wisconsin ex rel. LaFollette,* 450 U.S. 107,

122, 101 S.Ct. 1010, 1019, 67 L.Ed.2d 82 (1981) (quoting *Sweezy v. New Hampshire ex rel. Wyman,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957)). "These associational rights, however, are not absolute and are necessarily subject to qualification if elections are to be run fairly and effectively." *Munro v. Socialist Workers Party,* 479 U.S. 189, 193, 107 S.Ct. 533, 536, 93 L.Ed.2d 499 (1986).

The Supreme Court's decisions defining the associational rights of political parties can be separated into three groups: racial exclusion cases; ballot access cases; and internal party organization cases. The central tension underlying all of these cases is that of the public/private distinction: should political parties be treated as private associations of common interest properly free from the intrusive hand of state regulation, or as quasi-official public institutions integral to the success and stability of American representative democracy, or as something in between? Each group of cases has utilized somewhat different modes of analysis to reach somewhat different resolutions of that underlying problem. We examine each group in turn.

### 1. Racial Exclusion Cases

■■■ The so-called White Primary cases involved equal protection challenges to the racially exclusionary practices of various state party organizations. By expanding the state action doctrine, the Supreme Court pierced the public/private distinction with which political parties had previously avoided state regulation. The Court established that where the party nomination process is integral to the selection of public officeholders the party activities must be considered state action. *See Smith v. Allwright,* 321 U.S. 649, 663–64, 64 S.Ct. 757, 764–65, 88 L.Ed. 987 (1944) (political primaries that are an integral part of the machinery for choosing state officials constitute state action); *United States v. Classic,* 313 U.S. 299, 318–19, 61 S.Ct. 1031, 1039, 85 L.Ed. 1368 (1941) (same). *See also Gray v. Sanders,* 372 U.S. 368, 374, 83 S.Ct. 801, 805, 9 L.Ed.2d 821 (1963) (political primary constitutes state action where state enforces exclusion of certain potential voters); *Terry v. Adams,* 345 U.S. 461, 475–77,

73 S.Ct. 809, 816–17, 97 L.Ed. 1152 (1953) (exclusion of blacks from a pre-primary election of the Jaybirds, a political club whose candidate almost always secured the nomination of the Democratic Party, constitutes state action and violates the Fifteenth Amendment). These cases rejected the formalistic relegation of political parties to the sphere of the purely private, relying instead on a practical, functional analysis of the role played by parties in the electoral process. In *Terry v. Adams,* the Supreme Court went so far as to find state action present in the internal, racist policies of a powerful political club. The White Primary cases teach that realities, not labels, must guide our review of election laws.

### 2. Ballot Access Cases

■ These cases involved minor party challenges to state laws under the Equal Protection Clause, asserting unconstitutional favoritism toward the major parties. In *Williams v. Rhodes,* 393 U.S. 23, 25, 89 S.Ct. 5, 7–8, 21 L.Ed.2d 24 (1968), for example, the Supreme Court invalidated the Ohio election laws that, in combination, made it "virtually impossible" for any candidate to gain access to the ballot unless he or she was a candidate of the Republican or Democratic party. Prior to *Williams,* the Court had not recognized a non-racial claim of ballot access discrimination. Thereafter, in *Lubin v. Panish,* 415 U.S. 709, 718, 94 S.Ct. 1315, 1320–21, 39 L.Ed.2d 702 (1974), and *Bullock v. Carter,* 405 U.S. 134, 149, 92 S.Ct. 849, 858–59, 31 L.Ed.2d 92 (1972), the Court held that states may no longer demand filing fees of indigent candidates unless they also provide an alternate route to the ballot. In *American Party of Texas v. White,* 415 U.S. 767, 794–95, 94 S.Ct. 1296, 1312–13, 39 L.Ed.2d 744 (1974), the Court found that the denial of absentee ballot access to minor parties and their candidates violated the Equal Protection Clause. In *Anderson v. Celebrezze,* 460 U.S. 780, 805–

06, 103 S.Ct. 1564, 1578–79, 75 L.Ed.2d 547 (1983), the Court struck down Ohio's early filing deadline for independent presidential candidates because it placed an unconstitutional burden on those candidates' supporters. This line of cases has significantly limited the ability of states to exclude parties or others from the ballot by holding that such laws violate the free speech and associational rights of excluded candidates.[2]

Still, the Court has allowed that states may properly impose some restrictions on access to the ballot. In *Munro,* 479 U.S. at 194, 107 S.Ct. at 537, the Court reaffirmed the principle "that states have an 'undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot....'" Reasoning that states have a legitimate interest in preventing voter confusion through ballot overcrowding or the presence of frivolous candidates, *Munro* upheld a statute that denied a place on the general election ballot to any minor-party candidate who failed to receive at least one percent of the vote in Washington's open, all-party primary. *Id.* at 198–99, 107 S.Ct. at 539–40. In *Storer v. Brown,* 415 U.S. 724, 734–46, 94 S.Ct. 1274, 1281–87, 39 L.Ed.2d 714 (1974), the Court sustained disaffiliation requirements for independent candidates and allowed to stand petition signature requirements if found on remand to be necessary to serve the state's compelling interest in a manageable ballot. In *American Party of Texas v. White,* 415 U.S. at 776–95, 94 S.Ct. at 1304–13, the Court held constitutional a series of laws that directed smaller parties to nominate candidates by convention, excluded them from the state's primary election financing scheme, and imposed on them minimum signature requirements and special deadlines.

■ The ballot access cases establish that parties with demonstrable and signifi-

---

2. Though some of these cases are decided on equal protection grounds and others on associational grounds, this distinction need not detain us. In election cases, equal protection challenges essentially constitute a branch of the associational rights tree. When the Supreme Court finds a violation of Equal Protection, it is nevertheless First and Fourteenth Amendment associa-

tional rights which are inequitably burdened. In the case before us, we need not reach equal protection arguments because we find that the associational rights of all voters and political parties are impermissibly burdened by the dual primary and funding requirements of the Arkansas election code.

cant public support have a right to ballot access, at least outside the category of nonpartisan elections. They also make clear that where a statutory burden, such as a filing fee, operates to exclude a given candidate from the ballot, an alternative means of access must be provided absent a sufficiently strong state interest.

### 3. Internal Party Organization Cases

A third set of cases has addressed the permissibility of state intrusion into the internal mechanics of party organization. The Supreme Court has recognized that the vitality of American democracy depends upon political action initiated by citizens and unfettered by government interference and control. Accordingly, the Court has derived from the First and Fourteenth Amendments a line beyond which state regulation of political parties may not go. In *Eu v. San Francisco Democratic Com.*, 489 U.S. 214, 222–33, 109 S.Ct. 1013, 1019–26, 103 L.Ed.2d 271 (1989), the Court held unconstitutional a number of California laws that prevented the official governing bodies of political parties from endorsing candidates in party primaries, dictated the organization and composition of those bodies, limited the term of office of a party chair, and required that the chair rotate between residents of northern and southern California. In *Tashjian*, 479 U.S. at 229, 107 S.Ct. at 556–57, the Court struck down a law forbidding political parties from allowing non-members to vote in party primaries. In general, the Supreme Court has been least willing to uphold state regulations of party advocacy activities relating to the advancement of policies and candidates. The Court's reasoning has emphasized not only the central importance of political advocacy to the values underlying the First Amendment, but also the connected necessity of party autonomy. In essence, the internal affairs of political parties are off-limits to state regulation, unless the state finds it necessary to meet a compelling interest. As the Court stated in *Tashjian*, a "[p]arty's determination of the boundaries of its own association, and of the structure which best allows it to pursue its political goals, is pro-

tected by the Constitution." 479 U.S. at 224, 107 S.Ct. at 554.

To ensure the proper functioning of our representative democracy, most states have deemed it necessary to enact laws governing certain aspects of political parties. The Supreme Court has generally upheld laws to regulate the party activities most closely resembling public functions, such as the conduct of primary elections. For example, in *American Party of Texas v. White*, 415 U.S. at 781, 94 S.Ct. at 1306, the Court found the validity of Texas's mandatory party primary "too plain for argument."

One additional and related line of cases warrants mention. In *Democratic Party of United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981), *Cousins v. Wigoda*, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975), and *O'Brien v. Brown*, 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972), the Court explored the ability of the national parties to exercise control over their state-level counterparts, confronting in the process the scope of the associational rights of the national parties. The exclusionary issue in these cases differed somewhat from that found in the ballot access and White Primary cases. The Court allowed the party, at the national level, to prefer its own rules over those of the state where the individuals who would be excluded had, in effect, chosen to play by the rules of the national party. *See Democratic Party*, 450 U.S. at 123–24, 101 S.Ct. at 1019–20; *Cousins*, 419 U.S. at 489–90, 95 S.Ct. at 548–49; *O'Brien*, 409 U.S. at 5, 92 S.Ct. at 2720–21. These holdings have reinforced the ability of the national parties to control the activities of the state and local parties.

■ Together, these cases exhibit a somewhat inconsistent construction of the associational rights of political parties. Generally speaking, the Supreme Court has required that parties be inclusive, allowing all interested persons to participate in party activities. Nevertheless, the Court has invested parties with broad discretion to structure their own internal governance and activities. In balancing the various competing considerations, the Court has demonstrated heightened concern for the ability of voters to support candidates of their choosing. Hence, the Court has been inclined to allow minor parties and

independent candidates a reasonable opportunity to participate on the ballot. *See Anderson*, 460 U.S. at 804–06, 103 S.Ct. at 1578 (Ohio's early filing deadline for independent presidential candidates imposed unconstitutional burden). At the same time, the Court has acknowledged that states retain a legitimate interest in controlling the size of the ballot and preserving the integrity of elections and has, therefore, allowed some restrictions to stand. For example, in *Lubin v. Panish*, 415 U.S. at 715, 94 S.Ct. at 1319–20, the Court recognized that a state has an "interest in keeping its ballots within manageable, understandable limits."

In sum, these three sets of cases demonstrate that the Supreme Court has located political parties roughly midway between conventional public and private institutions, attributing to parties elements of both. The cases outline the difficult balances courts must strike between parties' interests in freedom from state intrusion, states' interests in regulating the electoral process and citizens' interests in political expression and participation. In seeking that balance, the Court has admonished that "there is 'no substitute for the hard judgments that must be made.'" *Anderson*, 460 U.S. at 789–90, 103 S.Ct. at 1570 (quoting *Storer*, 415 U.S. at 730, 94 S.Ct. at 1279).

## II.  The Arkansas Party Primary Election Scheme

In 1969, the Arkansas legislature replaced its "ancient and outdated" election code with a set of laws which, in substantial part, continue to govern the state's elections, campaigns and political parties. Acts 1969, No. 465, Art. 13, § 10. Consistent with the Supreme Court's understanding of parties as public/private hybrids, the bulk of the code's party regulations are restricted to such matters as campaign finance, primary election procedures and the certification of nominees.

Section 7–3–101 of the Arkansas Code establishes the basic duties and powers of "organized political parties." These include a right to set the qualifications for membership and a duty to set them for voters in party primaries. Ark.Code Ann. §§ 7–3–101(1) and (2). Other provisions lay down rules for

the selection of national, state and county committee members and general procedures to be followed at state and county conventions. §§ 7–3–102 to –107. Political participation by the Communist Party and its affiliates is forbidden. § 7–3–108.

At issue in this appeal is the combined effect of two statutes. The first, § 7–7–102(a), provides:

> Nominees of any political party for United States Senate, United States House of Representatives, state, district or county office to be voted upon at a general election shall be certified as having received a majority of the votes cast for the office, or as an unopposed candidate, at a primary election held by the political party in the manner provided by law.

The second, § 7–3–101(4), provides:

> [O]rganized political parties shall:
>
> . . . .
>
> (4) Pay the expenses of their own primary election. However, any part of the expenses of the primary may be paid by a county whenever an appropriation therefor is made by the quorum court of the county.

Thus, when more than one candidate seeks a party's nomination for an office, the party must conduct and provide funding for a primary election. Specifically, Arkansas mandates a "preferential" primary election followed by a "general" primary election. § 7–7–202. The general primary election is required only when no candidate in a given race receives a majority of the votes cast for that office. § 7–7–304. The top two vote-getters in the preferential primary advance to the general primary. Dates for primary elections are fixed by statute. § 7–7–203. A party must comply with all state laws governing primary elections, otherwise the election will not be declared a "legal election." § 7–7–201.

The only alternate means of ballot access requires the prospective candidate to file as an independent candidate and to submit a petition signed by a specified number of qualified electors. § 7–7–103. Candidates for county, township or district office must submit petitions signed by three percent of the qualified electors within the relevant po-

litical boundaries. § 7–7–103(c)(1). The number of qualified electors is defined as the total number of votes cast in the previous election for governor. § 7–7–103(c)(4). Candidates for statewide office must furnish petitions signed by the lesser of three percent or 10,000 of the state's qualified electors. § 7–7–103(c)(2). Independent candidates are allowed sixty days in which to gather the requisite signatures. § 7–7–103(c)(3). A candidate who was defeated in a party primary cannot later file as an independent candidate for the same office. § 7–7–103(f). In addition, Arkansas permits party nominations to be filled without a primary election when the nomination becomes vacant through, for example, death or resignation. § 7–7–104.

Thus, in combination, sections 7–7–102(a) and 7–3–101(4) establish that a party seeking to place nominees on the general election ballot must organize, conduct and pay for a party primary. Put another way, the only candidates who may appear on the general election ballot accompanied by party identification are those whose parties are willing and able to fund a primary election.

In part, state law fixes the weight of the financial burden imposed on political parties. For example, parties must compensate county clerks for their primary election services at a rate set by statute. § 7–5–415. Ballots must conform to specifications set forth by statute, § 7–7–305, and election day procedures are prescribed in detail. See, e.g., §§ 7–5–416, 7–7–308, 7–7–310. Conversely, Arkansas partially offsets the costs of conducting primary elections by requiring counties to bear "[t]he cost of preparing voting machines for all elections at which they are to be used ... including the cost of all necessary supplies and technical assistance required in preparing the machine and the cost of transporting voting machines to and from the polling places in each county...." § 7–5–508.

### III. Standard of Review

The Supreme Court has not spoken with unmistakable clarity on the proper standard of review for challenges to provisions of election codes. In some cases, the Court has articulated and employed a flexible test, calibrating the level of scrutiny to the seriousness of the burden imposed by the challenged law; yet on other occasions it has suggested that all election and voting regulations must be subjected to strict scrutiny.

In *Bullock v. Carter,* 405 U.S. at 143, 92 S.Ct. at 856, the Supreme Court announced that "not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review." The proper level of scrutiny for a particular set of regulations depends on "the extent and nature of their impact on voters." *Id.* The Court concluded that Texas's filing fee scheme "must be 'closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster." *Id.* at 144, 92 S.Ct. at 856. Variations on this flexible, sliding-scale standard have been employed in several subsequent cases. *See Burdick v. Takushi,* 504 U.S. 428, 432–34, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992); *Tashjian,* 479 U.S. at 214–15, 107 S.Ct. at 548–49; and *Anderson,* 460 U.S. at 788–89, 103 S.Ct. at 1569–70. In *Anderson,* the Court struck down Ohio's early filing deadline for independent candidates, explaining its test in terms highly deferential to state prerogatives:

> Each provision of [a state's election scheme], whether it governs the registration and qualifications of voters, the selection and eligibility of the candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends. Nevertheless, the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.

460 U.S. at 788, 103 S.Ct. at 1570. The Court in *Tashjian* directly imported the *Anderson* formulation of the sliding-scale approach and invalidated a Connecticut law which prevented parties from permitting nonmembers to vote in party primaries. 479 U.S. at 213–14, 107 S.Ct. at 547–49. In *Burdick,* the Court upheld Hawaii's prohibition on write-in voting. The Court summa-

rized the elements of the flexible approach as follows:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

504 U.S. at 434, 112 S.Ct. at 2063 (quoting *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570). The Court conditioned the rigorousness of the inquiry on "the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.* In *Burdick*, strict scrutiny is associated with "severe" restrictions. *Id.*

However, in another recent case, the Supreme Court has suggested that a law which imposes *any* appreciable burden on rights of association, expression and voting demands strict scrutiny:

> To assess the constitutionality of a state election law, we first examine whether it burdens rights protected by the First and Fourteenth Amendments.... If the challenged law burdens the rights of political parties and their members, it can survive constitutional scrutiny only if the State shows that it advances a compelling state interest, and is narrowly tailored to serve that interest.

*Eu*, 489 U.S. at 222, 109 S.Ct. at 1019 (citations omitted) (invalidating restrictions on the internal structuring of California's political parties).[3]

■ Because of the factual and analytic similarity between *Tashjian* and *Eu*, we cannot resolve their apparently inconsistent standards of review by isolating the applicability of each approach to particular subdivisions of the larger body of election and voting rights cases. For example, the case law does not sustain the proposition that the flexible approach governs burdens on voters' and candidates' rights, while strict scrutiny applies to burdens on the rights of political parties. Such a conclusion runs afoul not only of *Tashjian*, but also of logic: The rights of political parties derive from the associational rights of members and candidates, *Sweezy*, 354 U.S. at 250, 77 S.Ct. at 1211–12, and it would make little sense to afford greater protection to the rights of political parties than to the rights of voters and candidates. In any event, we need not attempt a definitive resolution of this problem in the case before us because our assessment of the burdens imposed by the combined effects of sections 7–7–102(a) and 7–3–101(4) upon the First and Fourteenth Amendment rights of voters and parties convinces us that we must apply strict scrutiny even under the more flexible, sliding-scale standard of review articulated in *Burdick*. We turn now to an examination of those burdens.

## IV. The District Court's Findings

■ In assessing the burdens imposed by Arkansas's primary election scheme, the district court made the following findings of fact. Over the past several election cycles, the Republican Party has proven unable to make available to potential primary voters more than a fraction of the number of polling places made available by the Democratic Party. In recent elections the number of Republican polling places was "very small ... in most counties." *Republican Party of Arkansas, et al. v. Faulkner County, et al.*, No. 92–130, slip op. at 9 (E.D.Ark. Feb. 25, 1994). In fact, "[o]n occasion, no polling

---

3. The precise standards of review in the earliest election code cases cannot so readily be classified. For example, in the ballot access case of *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), the Supreme Court applied strict scrutiny and struck down Ohio's election laws insofar as they prevented minor parties from placing candidates' names on the ballot. While Justice Black's opinion implies that strict scrutiny is required when First Amendment freedoms are "limited," the opinion discusses the required "compelling state interest" in connection with the "heavy burdens on the right to vote and to associate" imposed by Ohio's election code. *Id.* at 31, 89 S.Ct. at 10–11. Thus, *Williams* is arguably susceptible of two readings: the Court either mandated strict scrutiny in all election cases or instead employed it due to the gravity of the challenged burdens.

places have been available in several counties even though a Republican primary election was being conducted." *Id.* at 3. Voters wishing to cast ballots in a Republican primary are often forced to travel long distances, in some cases as much as sixty miles.

The court further found that the lack of Republican polling places resulted from a "nonavailability of funds" on the part of the Republican party. *Id.* at 3. Broadly speaking, the dearth of Republican polling places represented an inability, not an unwillingness, to raise sufficient funds: "the efforts of members of various local Republican parties to increase the number of available polling places have been many[,] . . . rang[ing] from pancake breakfasts to car washes to paying for the costs of the primary from their own pockets." *Id.* at 10. The court found that "the costs of Republican primaries are often borne by the individuals responsible for organizing them," and that only a few Arkansas counties have opted to reimburse parties for their primary election expenses. *Id.* at 3. In at least a few cases, the counties do not appear to have treated the Democratic and Republican parties equally in the provision of funds. Several counties had funded Democratic primaries, but not those of the Republican Party. In one case, a county appears to have indicated its willingness to fund the primary but later billed the parties after the election in proportion to the number of votes cast in their respective primaries.

The disparity in the availability of primary polling places has effectively forced many voters who wish to vote in the Republican primary to vote either in the Democratic primary or not at all. "As a general proposition, Arkansans vote for Republican candidates in general elections in numbers many times the total votes cast in the Republican primaries." *Id.* at 10. By contrast, the number of Arkansans voting in the Democratic primary typically exceeds the number voting for Democrats at the top of the ticket in the general election. For example, 86,977 voters cast ballots in the 1990 Republican primary, while 295,925 voted for the Republican gu-

bernatorial nominee in the general election. On the Democratic side, 491,146 voters cast ballots in the primary, while 400,386 voted for the Democratic gubernatorial nominee in November. In Faulkner County, the figures were similar.[4] The district court concluded that "voters often make the choice not to vote or to vote in a Democratic primary for a number of reasons other than a pure desire not to vote or a desire to vote for a Democratic candidate." *Id.* at 9. The district court's findings indicate that this phenomenon is attributable to the combined influences of confusion and convenience:

(1) Voters often arrive at the Democratic polling place under the mistaken assumption that it is also a Republican polling place and, consequently, choose to vote in the Democratic primary rather than expend the time and energy to locate the Republican polling place, (2) [v]oters often choose not to travel to the Republican polling place because of the distance and/or time constraints, and (3) [o]ften voters are simply not aware of the location of the Republican polling places.

*Id.* at 4–5 (footnotes omitted). Democratic polls are often placed at the same locations later used for general election balloting, "thus providing a certain advantage of familiarity." *Id.* at 5.

In sum, the district court found that Arkansas's primary election scheme "burdens both the ability of persons to exercise their right to vote for the person or persons of their choice and the ability of the Republican Party to reach all persons wishing to vote in the Republican primary." *Id.* at 5. Noting that reform legislation has been rejected "along party lines," the court suggested that the legislature's refusal to modify the present system has been motivated by a desire to preserve Democratic partisan advantage. *Id.*

The district court's conclusion that Arkansas's primary election scheme imposes a "heavy" burden on both voters and the Republican Party is a finding of fact, which we review for clear error. Finding no clear

---

4. In Faulkner County in 1990, 2,566 voters cast ballots in the Republican primary and 7,194 voted for the Republican gubernatorial nominee in

the general election. The Democratic primary attracted 12,394 voters, but only 9,908 supported the Democratic nominee in the general election.

error on the record before us, we affirm the district court's findings of fact.

## V. The Constitutionality of the Burdens

■ The district court concluded that Arkansas's "interest in choosing whether it wishes to provide funding for party primaries outweighs the burdens suffered by the Republican Party." *Id.* at 12. The court apparently refused to hold the Arkansas primary scheme unconstitutional due to its unwillingness to order the state to pay the costs of the required primaries.[5] We cannot agree that the court's reasoning properly disposes of the question before us. By relying on considerations of remedy to preclude a finding of unconstitutionality, the district court turned the analysis upside-down. By analyzing only the party funding requirement in isolation, the district court asked the wrong question and produced the wrong answer. The salient issue before us is not whether Arkansas must pay for the primary elections it requires, but whether its current statutory scheme impermissibly burdens the First and Fourteenth Amendment rights of voters and parties. As we have already accepted the finding of the district court that Arkansas's election code imposes "heavy" burdens on those rights, we now turn to the question of whether those burdens can be justified on constitutional grounds.

The state points out that the Arkansas election code is facially neutral in character, explicitly favoring no particular party; thus, the state argues, it deserves a less stringent standard of review. However, as outlined above, the Supreme Court has held that the strictness of judicial review must correspond to the weight of the burden imposed by the challenged election scheme. Our review of the burdens imposed by Arkansas's primary scheme convinces us that they are sufficiently severe to require the application of strict scrutiny, even under the more flexible *Burdick* approach. Accordingly, we examine Arkansas's election scheme to determine wheth-

er it is " 'narrowly drawn to advance a state interest of compelling importance.' " *Burdick,* 504 U.S. at 434, 112 S.Ct. at 2063 (quoting *Norman v. Reed,* 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992)). We must "not only determine the legitimacy and strength of each of those interests, [we] also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570.

In defending the laws before us, Arkansas advances four state interests: (1) protecting and preserving the integrity of the nominating process, (2) minimizing voter confusion, (3) protecting the public from frivolous or fraudulent candidates, and (4) maximizing the probability that the winning candidate will have received a majority of the popular vote. As outlined below, each of these interests has been accepted by the Supreme Court as a legitimate state interest in related contexts; however, Arkansas fails to indicate how any of them necessitates the burdens imposed by its dual requirement scheme.

First, Arkansas advances its interest in protecting the integrity of the nominating process to justify its dual requirements of mandatory primaries and party funding. We find the state's logic elusive. Certainly, the state has no less an interest in the integrity of its primary system than in that of its general election. As the Court noted in *Smith v. Allwright,* 321 U.S. at 664, 64 S.Ct. at 765, "[w]hen primaries become a part of the machinery for choosing officials, state and national, ... the same tests to determine the character of discrimination or abridgement should be applied to the primary, as are applied to the general election." But, contrary to Arkansas's intimations, electoral "integrity" does not operate as an all-purpose justification flexible enough to embrace any burden, malleable enough to fit any challenge and strong enough to support any restriction. The Supreme Court has invested "integrity" with a more specific and limited meaning:

---

5. The district court expressly declined to consider the combined effect of the mandatory primary and the party funding requirements, stating that "the plaintiffs have not asked this Court to hold unconstitutional the requirement that they conduct primaries, presumably because they wish to

continue having them." Slip op. at 18. Our review of the record reveals that the Republican Party's pleadings should fairly be read to include an attack on the combined effect of the two requirements and a corresponding prayer for relief.

A State indisputably has a compelling interest in preserving the integrity of its election process. Toward that end, a State may enact laws that interfere with a party's internal affairs when necessary to ensure that elections are fair and honest. *Eu*, 489 U.S. at 231, 109 S.Ct. at 1024. In particular, the Supreme Court has upheld restrictions on voter eligibility, including limitations based on residence, *Dunn v. Blumstein*, 405 U.S. 330, 343–44, 92 S.Ct. 995, 1003–04, 31 L.Ed.2d 274 (1972), citizenship, *Kramer v. Union Free School Dist. No. 15*, 395 U.S. 621, 625, 89 S.Ct. 1886, 1888–89, 23 L.Ed.2d 583 (1969), and age, *Oregon v. Mitchell*, 400 U.S. 112, 118, 91 S.Ct. 260, 261–62, 27 L.Ed.2d 272 (1970). The Court has sustained requirements that parties nominate candidates through primaries or conventions, *American Party of Texas*, 415 U.S. at 779–82, 94 S.Ct. at 1305–07, and that ballot petitions include only the names of voters who did not vote in any primary that year, *id.* at 785–86, 94 S.Ct. at 1308–09. Reasonable filing fees have been found constitutional, *Bullock*, 405 U.S. at 145, 92 S.Ct. at 856–57, as have mandatory waiting periods before voters changing party affiliation may vote in a party primary, *Rosario v. Rockefeller*, 410 U.S. 752, 761, 93 S.Ct. 1245, 1251–52, 36 L.Ed.2d 1 (1973), and disaffiliation requirements that deny ballot access to independent candidates who had been affiliated with any party within a year preceding a given election, *Storer*, 415 U.S. at 730, 94 S.Ct. at 1279. Clarifying its understanding of election process "integrity," the Court has explained that each of these laws made a demonstrable contribution toward "ensuring the order and fairness of elections." *Eu*, 489 U.S. at 232, 109 S.Ct. at 1025. Thus, to serve the goal of electoral integrity, a law must advance the honesty, fairness or orderliness of the process. By contrast, Arkansas has not attempted to explain how its dual requirements are necessary to meet these particular interests. In light of the burdens imposed on the Republican Party and the resulting confusion experienced by its members and adherents, we find that the laws before us produce, if anything, disorder and unfairness. Accordingly, we cannot conclude that sections 7–7–102(a) and 7–3–101(4), in combination, are

necessary to advance Arkansas's compelling interest in preserving the integrity of its primary process.

Next, Arkansas argues that its primary system acts to minimize voter confusion. *See Munro*, 479 U.S. at 194–95, 107 S.Ct. at 536–37; *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971). We detect no way in which the conditioning of ballot access on party financing of primary elections serves to reduce the risk of voter confusion. If anything, the findings of the district court indicate that the small number of Republican polling places increases voter confusion. On primary day a number of voters intending to cast ballots in the Republican primary arrive at the appropriate polling place for the general election, only to be told that the Republican ballot box is located elsewhere, often a considerable distance away. Indeed, some voters even enter the voting booth at Democratic polling places in the erroneous belief that they are Republican. If by "minimizing voter confusion" Arkansas means to argue that its scheme "foster[s] informed and educated expressions of the popular will," *Anderson*, 460 U.S. at 796, 103 S.Ct. at 1574, this claim also founders upon the shoals of experience. By requiring parties to deplete their pool of contributions to pay for primary elections, Arkansas substantially reduces the amount of party funds available to educate voters about candidates and campaign issues. "A State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism." *Anderson*, 460 U.S. at 798, 103 S.Ct. at 1575. In light of the combined effects of the dual requirements, we conclude that Arkansas's "legitimate interests in preventing voter confusion and providing for educated and responsible voter decisions in no respect 'make it necessary to burden the [Party's] rights.'" *Tashjian*, 479 U.S. at 221–22, 107 S.Ct. at 552 (quoting *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570) (brackets in original).

Finally, the state asserts that the combination of sections 7–7–102(a) and 7–3–101(4) is necessary to protect the public from frivolous or fraudulent candidates and to ensure that

the eventual victor obtains a majority of the votes cast. *See Bullock*, 405 U.S. at 145, 92 S.Ct. at 857 ("[T]he State understandably and properly seeks to ... assure that the winner is the choice of a majority, or at least a strong plurality.... Moreover, a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies."). *Cf. Munro*, 479 U.S. at 194–95, 107 S.Ct. at 536–37. On these points, the state's reasoning is simply impenetrable. In the absence of any guidance from the state, we can divine no link between these interests and the dual requirements. By effectively depressing the number of individuals casting votes in the Republican primary, Arkansas has likely increased, not decreased, the risk that a frivolous or fraudulent candidate could win that party's nomination. While it may be true that, by itself, the requirement that a party hold a primary election to select its nominees is necessary to meet the state's interest in ensuring that the majority's will is reflected in the winner of the election process, *see Storer*, 415 U.S. at 735, 94 S.Ct. at 1281–82, the state's interest does not necessitate the additional requirement that parties pay for, as well as conduct, primary elections. In combination, Arkansas's dual requirements cannot be justified as necessary to protect the public from frivolous candidates or to ensure that the eventual victors enjoy the majority's support.

The fact that no other state imposes the full costs of primary elections on political parties as a condition of ballot access further undermines Arkansas's contention that the dual requirements serve a state interest of compelling importance. Because Arkansas has failed to identify any compelling state interest which necessitates the imposition of such heavy burdens on the associational rights of parties and voters, we conclude that the requirements that parties conduct and pay for primary elections are unconstitutional in combination.[6]

## VI. Other Claims

The Republican Party also argues that the challenged portions of the Arkansas election code constitute a taking under the Fifth Amendment, impose a poll tax in violation of *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), and deny "free and equal" elections under Ark. Const. Art. 3, § 2. We have considered these claims and reject each as meritless.

## VII. Conclusion

Our decision today is an expression of the conviction that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964). We find that the state of Arkansas has failed to come forward with a compelling state interest necessitating the heavy burdens placed upon the First and Fourteenth Amendment rights of voters and political parties by the dual requirements that parties both conduct and fund primary elections as a condition of ballot access. Consequently, the combined effect of Ark.Code Ann. §§ 7–7–102(a) and 7–3–101(4) renders those provisions unconstitutional as they operate in conjunction with one another. Cognizant of our role as a federal court, we do not purport to advise Arkansas on the best means of rendering constitutional its election code: that decision rests with the sound judgment of the Arkansas legislature.

6. We note that the Supreme Court has clearly endorsed and arguably required the practice of holding election laws unconstitutional in combination without considering the constitutionality of particular provisions in isolation. For example, in *Williams*, 393 U.S. at 34, 89 S.Ct. at 12, the Supreme Court held that "the totality of the Ohio restrictive laws taken as a whole imposes a burden on the voting and associational rights which we hold is an invidious discrimination, in violation of the Equal Protection Clause."