**TAXPAYERS' CHOICE VOLUNTEER COMMITTEE, an unincorporated association; Ruth M. Stukel; and Roxanne Wygant, acting on their own behalf, on behalf of all petitioners who signed a petition to change the Roseau County seat, and on behalf of all persons in Roseau County who have spoken or acted in favor of or otherwise support holding an election on whether the Roseau County seat should be moved, Plaintiffs,**

v.

**ROSEAU COUNTY BOARD OF COMMISSIONERS; County of Roseau; Doran Horner, Dick Jackson, Orris Rasmussen, Glenn Darst, and John Spina, in their individual capacities as Roseau County Commissioners; Anne K. Granitz, in her capacity as Roseau County Auditor; and John and Jane Does 1–25, Defendants,**

**Kraus–Anderson Construction Company, Brothers Fire Protection Co., E & L Electric Company, and Grant's Mechanical, Incorporated, Nominal Defendants,**

and

**Roseau County Citizens' Committee on the County Seat, Intervenor Defendants.**

Civil No. 6–95–112.

United States District Court,
D. Minnesota,
Sixth Division.

July 20, 1995.

James G. Bullard and Gregory L. Poe, Leonard Street & Deinard, Minneapolis, Minnesota, for Plaintiffs.

John D. French and John F. Beukema, Faegre & Benson, Minneapolis, Minnesota for Defendants Roseau County Board of Commissioners, County of Roseau, Doran Horner, Dick Jackson, Orris Rasmussen, Glenn Darst, John Spina, Anne K. Granitz, and John and Jane Does 1–25.

Francis J. Connolly, General Counsel, Kraus–Anderson Construction Company, Minneapolis, Minnesota, for Nominal Defendant Kraus–Anderson Construction Company.

Jerome S. Rice, Mahoney, Hagberg & Rice, Ltd., Minneapolis, Minnesota, for Inter- venor Defendants Roseau County Citizens' Committee on the County Seat.[1]

KYLE, District Judge.

## Introduction

Plaintiffs commenced this action, pursuant to 42 U.S.C. §§ 1983 and 1985, alleging Defendants violated their constitutional rights in connection with Plaintiffs' attempts to require an election pursuant to Minnesota Statutes chapter 372 ("Chapter 372") to move the county seat of Roseau County from the City of Roseau to the City of Warroad. Plaintiffs seek a declaration that Chapter 372 is unconstitutional, on its face and as applied; a declaration that Defendants violated their First and Fourteenth Amendment rights; a declaration that certain contracts entered into by the Nominal Defendants [2] to build a new courthouse in the City of Roseau are illegal, void and unenforceable and an order cancelling said contracts; an injunction ordering the Defendants to call an election in accordance with the terms set forth in Chapter 372; temporary and other permanent injunctive relief to maintain the "status quo"; and an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988. This matter is currently before the Court on the Plaintiffs' Motion for a Preliminary Injunction seeking to enjoin the Defendants and the Nominal Defendants from taking any further action to build a new county courthouse in the City of Roseau. For the reasons set forth below, the Court will deny the Plaintiffs' Motion.

## Background

### I. Parties

Plaintiff Taxpayers' Choice Volunteer Committee ("TCVC") is an unincorporated association of citizens, taxpayers, and residents of Roseau County who have either signed a petition to change the county seat of Roseau County or who have spoken or acted in favor of holding an election to determine whether the county seat of Roseau County should be moved. (Am.Compl. ¶ 6.) Plaintiff

---

1. Although the State of Minnesota is not a formal party to this action, the Attorney General of the State of Minnesota has filed a document with the Court setting forth the State of Minnesota's position on various issues raised in this matter.

2. The Court will refer to Defendants Kraus–Anderson Construction Company, Brothers Fire Protection Co., E & L Electric Company, and Grant's Mechanical Incorporated collectively as the "Nominal Defendants."

Ruth M. Stukel is a co-chair of TCVC and a resident and legal voter of Roseau County (*id.* ¶ 7); Plaintiff Roxanne Wygant is a TCVC volunteer and a resident and legal voter of Roseau County (*id.* ¶ 8).

Defendant Roseau County is a public corporation and a political subdivision of the State of Minnesota. (*Id.* ¶ 9.) Defendant Roseau County Board of Commissioners ("Board") is the duly elected governing body of Roseau County. (*Id.* ¶ 10.) Defendants Dick Jackson, Orris Rasmussen, Glenn Darst and John Spina are Board members and residents of Roseau County. (*Id.* ¶¶ 11–15.) Defendant Anne K. Granitz is the Roseau County Auditor and is a resident of Roseau County. (*Id.* ¶ 16.) Defendant John and Jane Does 1–25 are residents of the State of Minnesota who are alleged to have acted with Board members and other county officials with the purpose and effect of depriving Plaintiffs of their constitutional rights. (*Id.* ¶ 17.)

Nominal Defendant Kraus–Anderson Construction Company, Brothers Fire Protection Company, E & L Electric Company and Grant's Mechanical Incorporated are business entities whom Plaintiffs allege have executed contracts with the Board agreeing to construct a new courthouse in the City of Roseau. (*Id.* ¶¶ 18–21.)

Intervenor Defendants Roseau County Citizens' Committee ("Roseau Committee") became a defendant intervenor pursuant to the July 13, 1995 Order of United States Magistrate Judge Raymond L. Erickson. (Doc. No. 49). Plaintiffs allege the Roseau Committee "is the primary organized body opposed to Plaintiffs' petition drive." (Am. Compl. ¶ 22.)

## II. Factual Background

This action arises out of a "gift," announced by the Marvin family of the City of Warroad, Roseau County, of $4.5 million for the construction of a new county courthouse if the voters of the County decided in an election held pursuant to Chapter 372 to move the county seat of Roseau County to the City of Warroad. (Am.Compl. ¶ 3.) The conditional gift was announced following the Board's decision to build a new courthouse in

the City of Roseau for approximately $2 million. (*Id.;* Connolly Aff., Ex. A.) The Plaintiffs' claims relate to their efforts to move the county seat to Warroad following the Marvin's offer.

### A. Statutory Background

Chapter 372 provides the exclusive procedure whereby the county seat of a Minnesota county may be moved. This procedure imposes the following requirements:

(1) 60 percent of those voting in the county at the preceding general election must sign a petition requesting the county seat be moved;

(2) The petition must contain the following language "To the county board of the county of _____, Minnesota: The undersigned legal voters of this county request that the county seat be changed to (designated place)"; and

(3) The petition must be accompanied by at least two affidavits executed by signors of the petition stating that the petition signatures are genuine, were signed within 60 days before the date of the affidavits and were signed by legal voters.

*See* Minn.Stat. § 372.01.

After a petition has been submitted to the county auditor according to the terms of section 372.01, the county board must meet and determine whether (a) the petition signatures are genuine; (b) any signers were, at the time of signing, not legal voters of the county; (c) the signatures were not attached within sixty days before filing; and (d) any of the signatures had been withdrawn. Minn. Stat. § 372.03. During the course of this inquiry, the board must receive "[a]ny competent evidence bearing upon the matter committed to the determination of the board," and "any voter of the county may appear and be heard in respect to" the board's inquiry, "under reasonable rules as the board may prescribe." *Id.* The meeting must take place at least 15 but not more than 20 days after the filing of the petition with the county auditor. Minn.Stat. § 372.01. The board must accordingly strike all signatures which do not comply with the requirements set forth in section 372.01. Minn.Stat.

§ 372.03. The county auditor must order a special election as set forth above if, after reviewing the petition, the county board concludes the names of at least 60 percent of those voting in the last election remain on the petition. Minn.Stat. § 372.04. The county seat will be moved to the location specified on the petition if 55 percent of all votes cast in the election favor the change.[3] Minn.Stat. § 372.08.

### B. The Petition Process

TCVC volunteers began circulating "petition cards"[4] on January 23, 1995. (Am. Compl. ¶ 28.) The cards were circulated throughout the county in person, by mail, and by a newspaper circular. (Id.) Signed cards were then mailed to TCVC or deposited in collection boxes located throughout the county.

TCVC's petition drive was strongly resisted by the Roseau Committee and others. Plaintiffs allege that throughout the 60–day circulation period, TCVC's opponents, including the Defendants, intimidated and threatened potential signatories in a "campaign" to prevent persons from signing the petition cards. (Id. ¶ 30.) Plaintiffs further allege that due to this intimidation and harassment, many of the petition's signatories requested TCVC to withdraw their names from the petition before submission to the County Board.[5] (Id. ¶¶ 32–33.) TCVC complied with these requests. (Id.)

TCVC obtained 4,098 petition cards within the 60–day period. On March 24, 1995, these signatures were submitted to the Roseau County auditor, along with sworn affidavits in conformance with section 372.01. (Id. ¶ 33.) This number exceeded the 60 percent minimum required for an election (3,814) by 284 signatures.[6] (Id.) On April 11, 1995, the Board convened a meeting to consider TCVC's petition; this meeting continued until May 2, 1995.

Plaintiffs allege the Board engaged in "delay tactics" designed to inhibit the petition procedure under the guise of verifying signatures by exhaustively reviewing each of the 4,098 petition cards and requiring signatories to personally appear to defend the validity of their signatures. (Am.Compl. ¶ 41.) Plaintiffs allege that prior to and during the course of the Board's meeting, the petition's opponents, including several of the Defendants, targeted signatories and made personal threats of economic reprisal, harassed and lied to signatories, and made false statements for the purpose of inducing withdrawals from the petition.[7] (Id. ¶ 52.)

---

3. Minnesota law requires that a county's courthouse be located in its county seat. Minn.Stat. § 373.05.

4. These cards required the signer to attest "[t]he undersigned legal voter of the County of Roseau requests that the County Seat be moved to Warroad." (Hoefs Aff., Ex. A.) In addition to a signature, TCVC's signature card required the signers' name, address, telephone number, date of execution and instructed "[t]o sign this petition, you must be a resident of Roseau County, a United States citizen and 18 years of age or older. If sufficient signatures are collected, a special election will be held to vote on the question of changing the County Seat to Warroad." (Id.)

5. Plaintiffs allege the Chairman of the Roseau Committee threatened to publish the names of the petition's signatories in order to harass and intimidate them and other potential signatories. (Am.Compl. ¶ 30.) Seeking to prohibit publication of the petition cards, the Plaintiffs commenced an action requesting injunctive relief in Minnesota District Court. (Id. ¶ 35.) Plaintiffs'

request was denied initially and on appeal. (Id. 36; see note 17, infra.)

6. In total, 6,356 votes were cast in Roseau County general election in 1994, (Am.Compl. ¶ 34), thus the number of petition signatures TCVC submitted constituted approximately 64 percent of the number of votes cast in the 1994 election.

7. Specifically, Plaintiffs claim opponents of the petition, including several Defendants, conducted an "intimidation campaign" publicly on the radio, television, and in the local newspapers and privately by telephone and face-to-face meetings. (Am.Compl. ¶¶ 53–56.) In the course of this opposition, Plaintiffs further allege "[e]lderly petitioners were coerced into withdrawing because they were falsely told they would lose their nursing home benefits if they did not withdraw," that Defendants "falsely threatened that Native American petitioners would lose governmental benefits if they claimed to be residents of Roseau County" and that Defendants falsely told petitioners of Southeast Asian origin they were not citizens of the United States eligible to sign the petition. (Id. ¶¶ 56–57.)

On May 2, 1995, the Roseau Committee filed 274 notices of withdrawal with the Board. The Board established a committee [8] to review these withdrawals and determine their authenticity. This committee set aside six withdrawals for further review, eliminated six which it found to be duplicates of previous withdrawals, and added sixteen withdrawals it previously had received. (Moren Aff. ¶ 15.) The Committee then determined 286 withdrawals were valid. (*Id.*) As a result, the petition failed by two votes to meet the 60 percent requirement imposed by Chapter 372. Additionally, during the course of the Board's review, the County Attorney identified 24 petition cards which were not valid because they were signed by convicted felons whose voting rights had not been restored, signatories under legal guardianship, or persons who were not residents of Roseau County. (*Id.* ¶ 15.) After receiving the withdrawals, the Board, by a 4–1 vote, declared the petition invalid. This action followed.

On June 15, 1995, Plaintiffs moved for a temporary restraining order seeking to enjoin the Board from awarding construction contracts for the proposed courthouse; that motion was denied.[9] (*See* Doc. No. 9.) The Board subsequently awarded four contracts for the courthouse's construction to the Nominal Defendants on June 16, 1995. This Motion followed, and, after receiving briefs pursuant to an agreed upon schedule of counsel, was heard by the undersigned on July 19, 1995.

### C. Plaintiff's Claims

Plaintiffs' Complaint is based primarily on purported violations of their First and Fourteenth Amendment rights to associate, to vote, to ballot access and to due process and equal protection of the laws. Plaintiffs' claims fall into three categories. *First,* Plaintiffs contend section 372.01 is unconstitutional on its face because: (a) it compels voters to state a voting preference (preferred location of county seat), (b) the 60 percent requirement and 60–day petition limitation period are unduly burdensome and, in the alternative (c) the cumulative burdens imposed by (a), (b) and the remaining provisions of Chapter 372 make this section unconstitutional even if the individual requirements standing alone do not. *Second,* Plaintiffs contend Defendants unconstitutionally applied Chapter 372 by failing to announce rules in advance of its April 11, 1995 meeting to govern its consideration for the petition and withdrawals, failing to impose "reasonable" time limitations, and failing to properly inspect the withdrawals. *Third,* Plaintiffs contend the Defendants' delay, interrogation of petition signatories, remiss acceptance of withdrawals, and active participation in and tolerance of discriminating and intimidating withdrawal tactics violated their due process rights under the Fourteenth Amendment.

### Discussion

 In determining whether to issue a preliminary injunction, the Court must consider the following four factors:

(1) the threat of irreparable harm to the moving party should a preliminary injunction be denied;

(2) the balance between this harm and the harm that granting the injunction will cause to the other parties litigant;

(3) the probability that the moving party will succeed on the merits; and

(4) the public interest.

*Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981) (en banc). A preliminary injunction is generally considered to be "a drastic and extraordinary remedy [which] is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.,* 995 F.2d 1566, 1568 (Fed.Cir.1993), *cert. denied,* ——— U.S. ———, 114 S.Ct. 923, 127 L.Ed.2d 216 (1994); *Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc.,* 815 F.2d 500, 503 (8th Cir. 1987) (cautioning that a preliminary injunction is an "extraordinary remedy"). The party requesting the injunction bears "the complete burden" of proving that a preliminary injunction should be granted. *Gelco*

---

8. This committee consisted of Glen Dart, a Board member, Anne Granitz, County Auditor, and Michelle Moren, County Attorney. (Moren Aff. ¶ 15.)

9. The Honorable James M. Rosenbaum, United States District Judge for District of Minnesota.

*Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir.1987).

In their present Motion, Plaintiffs request an injunction enjoining the Defendants and the Nominal Defendants from "taking any further action to build a new county courthouse at taxpayer expense in the City of Roseau." (Pls.' Notice of Mot., Doc. No. 13.) Although requested in their Complaint, the Plaintiffs do not currently seek an injunction ordering the Defendants to call a special election to vote on their proposal to move the County courthouse to the City of Warroad or to re-initiate the petition process without the challenged restraints imposed under Chapter 372. The Court accordingly limits its analysis to applying the *Dataphase* factors to Plaintiffs' requested relief.

### A. Threat of Irreparable Harm

Although no single factor is dispositive with respect to a preliminary injunction, *Dakota Indus., Inc. v. Dakota Sportswear, Inc.,* 988 F.2d 61, 64 (8th Cir.1993), failure to demonstrate immediate and irreparable harm is adequate grounds to deny the motion. *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.,* 871 F.2d 734, 738 (8th Cir.1989) (en banc); *Minnesota Chapter of Assoc. Builders and Contractors v. County of St. Louis,* 825 F.Supp. 238, 242 (D.Minn. 1993). Thus, "[o]nce a court determines that the movant has failed to show irreparable harm absent the injunction, the inquiry is finished and the denial of the injunctive request is warranted." *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 420 (8th Cir. 1987); *see also Glenwood Bridge, Inc. v. City of Minneapolis,* 940 F.2d 367, 371 (8th Cir. 1991) ("the movant's failure to sustain its burden of proving irreparable harm ends the [preliminary injunction] inquiry"). Moreover, "establishing a *risk* of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'" *ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 225 (3d Cir.1987) (emphasis added) (citation omitted). Thus "possible or speculative harm is not enough" to justify a preliminary injunction. *Bloom v. O'Brien,* 841 F.Supp. 277, 279 (D.Minn.1993); *see also Local Union No. 884 v. Bridgestone/Firestone, Inc.,* 58 F.3d 1247, 1255 (8th Cir.1995)

(reversing district court's entry of preliminary injunction because "the possible harm identified is wholly speculative, and because it is, it cannot be called irreparable harm").

In their Motion, Plaintiffs summarily conclude they have satisfied the *Dataphase* irreparable harm requirement because "[t]he loss of constitutionally-protected rights, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" (Pls.' Mem. in Supp. of Mot. at 21 (citing *Kirkeby v. Furness,* 52 F.3d 772, 775 (8th Cir.1995))). Assuming, *arguendo,* that the Plaintiffs have constitutionally protected rights in the Chapter 372 petition process, and further that Defendants violated these rights, the Plaintiffs have failed to show this harm warrants the injunctive relief requested. The pertinent inquiry under this first portion of the *Dataphase* analysis is not whether Plaintiffs have been irreparably harmed, or even if they are continuing to be irreparably harmed. Rather, the inquiry is whether *the injunctive relief sought* is necessary *to prevent* irreparable harm. *Bloom v. O'Brien,* 841 F.Supp. 277, 279 (D.Minn.1993).

In this case, Plaintiffs' claim is based upon their alleged constitutional right to petition for and hold a special election to move the County seat. Plaintiffs have failed to demonstrate that an injunction enjoining "Nominal Defendants from taking any further action to build a new county courthouse at taxpayer expense in the City of Roseau" will prevent further deprivations of this right. If, on the merits, the Court concludes Chapter 372 is unconstitutional and Plaintiffs are entitled to submit their proposal to move the County seat to a special election, they will be free to do so. The fact that construction may have commenced on a courthouse in the City of Roseau will not prohibit or impair this relief.

Plaintiffs additionally allege the requested relief is necessary to "preserve the status quo" and that "if construction of a courthouse commences in the City of Roseau, the election that should have already taken place, under the conditions that would have applied, will never occur." (Pls.' Reply Mem. at 4; Pls.' Mem. in Supp. of Mot. at 21–22.) However, it is readily apparent from the materi-

als submitted by the parties that, due to the public fervor the petition drive and subsequent rejection created in Roseau County, the election conditions that "would have applied" to the Plaintiffs' requested election absent the Defendants' purportedly illegal conduct are gone—the bell cannot be unrung. The salient question for the Court is whether the Plaintiffs have demonstrated commencing construction of a courthouse in the City of Roseau poses an immediate, non-speculative threat to their ability to place a proposal to move the county seat before the county citizens in a special election, not whether the County Board should accept the proposed gift from the Marvin family. The Plaintiffs have not made this demonstration. The incidental effect that construction of a courthouse in the City of Roseau might have on the Plaintiffs' ability to initiate an election ballot to move the county seat is simply too attenuated and speculative to warrant the "drastic and extraordinary remedy" of a preliminary injunction.

◼ The Court appreciates the fact that the Board's decision to award construction contracts for a new county courthouse may affect the voter's desire to move the county seat. This is readily apparent from the background of this case and has not been ignored. As indicated above, however, the Plaintiffs' legal interest in this case relates to moving the county seat, not where to construct a courthouse. The Court, both practically and as a matter of judicial principle, cannot enjoin all of the myriad county actions the Board deems proper, or actions of the other various Defendants, merely because such actions might impact a resident's inclination to support or oppose moving the county seat. The Court finds this line of inquiry particularly inappropriate; this is a task for sociologists, not the judiciary. The countless factors which motivate voters are speculative, intangible, and inherently transitory. The Court categorically declines to rely upon

them as a legally cognizable basis upon which to monitor and disrupt the discretionary decisions of a duly elected local government.

◼ Finally, during oral argument, Plaintiffs further alleged that enjoining construction of a new courthouse was necessary to preserve the County taxpayers' ability to take advantage of the gift from the Marvin family and to prevent the unnecessary expenditure of public funds. This relief is not consonant with the substance of their claim or with the relief which may be available if the Plaintiffs were to prevail on the merits. In *Minnesota Ass'n. of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80 (8th Cir.1995), the Eighth Circuit recognized the "discontinuity" between the plaintiffs' alleged statutory violations and the relief requested and dissolved the district court's preliminary injunction.[10] *Id.*, at 82. In the present case, the Plaintiffs' claims relate to their alleged right to move the County seat. This right is created by Chapter 372 and purportedly is protected by the United States Constitution. However, neither the Constitution nor Minnesota law provides the Plaintiffs with a right to compel the county to accept the Marvin family's offer or to determine how county funds will be spent. These decisions are committed to the County Board's discretion, *see* Minn.Stat. ch. 375, and could not be imposed by this Court even if Plaintiffs were to ultimately prevail on their claims.

Although the Court finds Plaintiffs have failed to demonstrate irreparable injury, the Court will briefly address the remaining *Dataphase* factors.

### B. Balance of Harm

◼ Under the second factor in the *Dataphase* analysis, the Court considers whether the harm likely imposed on the nonmoving party by issuing the injunction outweighs the harm imposed on the moving party by deny-

---

10. The plaintiffs in the *Nurse Anesthetists* case alleged the defendants violated federal and state competition laws and the Minnesota whistleblower statute, Minn.Stat. § 181.932. The district court entered a preliminary injunction barring defendant employers from discharging plaintiffs or others because of their participation in the plaintiffs' lawsuit. The Eighth Circuit dissolved the injunction and noted that "[w]e . . . fail to understand how the [whistleblower] statute provides a premise for the injunction's prohibitions on employer personnel actions based on employees' participation in this litigation." *Minnesota Ass'n. of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 82 (8th Cir.1995).

ing the injunction. "The balance of harm must tip decidedly toward the plaintiffs to justify issuing a preliminary injunction." *Marigold Foods, Inc. v. Redalen*, 809 F.Supp. 714, 720 (D.Minn.1992).

■ Plaintiffs claim the harm caused by not having "an election that would have occurred but for the constitutional violations" greatly outweighs the harm the Defendant County may suffer if it foregoes construction of a new courthouse until the Plaintiffs' constitutional claims are resolved. In opposition to the Plaintiffs' Motion, the Defendant County claims it will suffer substantial harm if construction is enjoined because (1) the old courthouse is not in compliance with the Americans with Disabilities Act, and thus subjects the County to administrative penalties and potential civil liabilities and (2) costs may rise due to construction delays and rebidding. (Moren Aff. ¶ 20.)

The Court finds the balance of harms does not tip decidedly in either party's favor. With regard to the Plaintiffs' alleged harm, the Court notes that Plaintiffs have focused on the wrong "harm." Assuming Plaintiffs' constitutional rights have been violated, the proffered injunction will not enable Plaintiffs to conduct a petition or participate in an election that would have occurred "but for" the alleged constitutional violations. This "harm" exists and will continue to exist irrespective of whether the Court enjoins construction of the courthouse. Instead, as set forth above, the harm imposed by not enjoining the proposed construction is the potential incidental effect such construction may ultimately have upon the Plaintiffs' ability to obtain a favorable vote on an election to move the county seat. Alternatively, the County's alleged harms are also speculative and could be adequately protected by conditioning any injunction on the posting of a security bond to cover any increased costs occasioned by the delay. *See Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 373 (8th Cir.1991) (finding bond sufficient to protect city's interest in potential

increased costs caused by enjoining its proposed construction project).

### C. Probability of Success on the Merits

■ In applying the third factor of the *Dataphase* analysis, the Court does not consider whether the movant will ultimately prevail on the merits, and must "avoid deciding with any degree of certainty who will succeed or not succeed." *Glenwood Bridge*, 940 F.2d at 371 (citation omitted). Rather, the court must "flexibly weigh the case's particular circumstances to determine 'whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'" *Calvin Klein Cosmetics Corp. v. Lenox Lab.*, 815 F.2d 500, 503 (8th Cir.1987) (quoting *Dataphase*, 640 F.2d at 113). In this, as with the other *Dataphase* factors, the movant bears the "complete burden." *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987).

#### 1. Constitutional Standards

■ Plaintiffs' claims relating to the constitutionality of Chapter 372, its application, and the Board's withdrawal process purportedly derive from constitutionally protected "associational" rights.[11] The right to "associate" is a "penumbral right not expressly granted by the Constitution, but implied through the First Amendment rights to speech, petition and assembly." *Republican Party of Arkansas v. Faulkner County*, 49 F.3d 1289, 1292 (8th Cir.1995). The right to "engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *Id.* (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958)); *see also Kusper v. Pontikes*, 414 U.S. 51, 57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973) ("freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Four-

---

**11.** In their Memorandum, Plaintiffs classify their claims as including their right to political association, reasonable ballot access, a secret ballot, equal protection, due process and freedom of speech. Plaintiffs refer to these claims collectively as "associational rights."

teenth Amendments") (quotation omitted). Thus Courts have generally held that such rights, where they are found to exist, are entitled to constitutional protection.

Plaintiffs' claims involve several unsettled areas of constitutional law. First, Plaintiffs have failed to show they have a constitutionally protected interest in the petition procedure established under Chapter 372 or in voting to move the County seat in a special election. Although political "associational" freedoms are clearly protected by the First and Fourteenth Amendments, Plaintiffs' claims do not fit clearly within the traditional "voting rights" cases upon which they rely. Plaintiffs' challenge to Chapter 372 does not involve a citizen's traditional right to select an individual to serve as a governmental representative in public office. This right is unquestionably protected. Instead, it involves the purported "right" to relocate their county seat. This right is not constitutionally derived, but arises solely out of a state-created procedure, in the absence of which the Plaintiffs would have no claim and no ability to move their county seat. Several Courts have explicitly recognized that such state-created "rights" are not fundamental rights protected under First and Fourteenth Amendment. *See Taxpayers United for Assessment Cuts v. Austin,* 994 F.2d 291, 296 (6th Cir.1993) (holding plaintiffs' interest in signing a petition to initiate legislation was not entitled same protection as exercising the "right to vote"); *Kelly v. Macon–Bibb Coun-*

*ty Bd. of Elections,* 608 F.Supp. 1036 (M.D.Ga.1985) (holding that referendum procedure did not involve constitutional "right to vote")[12]; *see also Baldwin v. City of Winston–Salem, N.C.,* 710 F.2d 132, 134 (4th Cir.) ("[i]t has long been held that the creation and redrawing of political subdivisions ... are peculiarly matters involving state political concerns"), *cert. denied,* 464 U.S. 1012, 104 S.Ct. 536, 78 L.Ed.2d 716 (1983).[13] Thus, as a preliminary matter, the Court finds that Plaintiffs have failed to show they have a constitutional right to petition to move the county seat. The ramifications of this determination will be set forth in greater detail below.

Second, the Court notes that the standard of review applied in considering constitutional challenges to regulations relating to traditional elections is not firmly established. The Defendants contend that such challenges should be assessed under a "sliding-scale" approach implemented by the Supreme Court in *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (finding state prohibition against write-in candidates in general election did not violate citizens' First and Fourteenth Amendment rights). *Takushi* summarized this approach as follows:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff

**12.** The court in *Kelly* considered whether a state statute which permitted voters to call a county referendum when 10 percent of the registered voters who voted in the preceding election signed a petition requesting the referendum. The Plaintiffs claimed the petition procedure imposed by the statute violated their First and Fourteenth Amendment rights. The Court upheld the statute and explained:

> Plaintiffs, however, have not been prohibited from exercising a fundamental constitutional right. This is *not* a "right to vote" case; referendums, unlike general elections for a representative form of government, are not constitutionally compelled.... There being no fundamental constitutional right to call a local referendum, defendants are not required to establish a compelling state interest in support of their construction of the challenged statute.

*Kelly v. Macon–Bibb County Bd. of Elections,* 608 F.Supp. 1036, 1038–39 (M.D.Ga.1985).

**13.** The Plaintiffs note that the Supreme Court has indicated that *solicitation* of signatures for a state-created referendum process is "core political speech" and thus a state restriction which prohibited paying persons to solicit signatures was subject to strict scrutiny and held unconstitutional. *Meyer v. Grant,* 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). Contrary to Plaintiffs' claims, however, *Meyer* does not hold that any burden associated with a state-created referendum process is constitutionally protected nor does it hold that citizens have a constitutional right to vote in state referenda. Instead, *Meyer* relied on its view that prohibiting paid solicitors limited *discussion* of political issues raised in the initiative and therefore violated the First Amendment. It did not hold or suggest plaintiffs had a constitutional right in voting on the referendum itself.

seeks to vindicate" against "the precise interest put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Id.* at 434, 112 S.Ct. at 2063 (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983); *see also Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972) (noting "not every limitation or incidental burden on the exercise of voting rights is subject to a strict standard of review"). Under this flexible standard, when an election law subjects First and Fourteenth Amendment rights to "severe" restrictions, the law must be "narrowly drawn to advance a state interest of compelling importance," but when the law imposes only "reasonable, non discriminatory restrictions ... the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (quotations omitted).

Alternatively, the Plaintiffs contend their claims should be assessed under the standard of review set forth by the Supreme Court in *Eu v. San Francisco County Democratic Central Comm.,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1988) (holding state ban of primary endorsements and regulations relating to internal governance of political parties violated First and Fourteenth Amendments). In *Eu,* the Supreme Court indicated that "strict scrutiny" applied to any law which imposed a burden on rights of association, expression and voting. The Court specifically instructed:

> To assess the constitutionality of a state election law, we first examine whether it burdens rights protected by the First and Fourteenth Amendments ... If the challenged law burdens [such rights], it can survive constitutional scrutiny only if the State shows that it advances a compelling state interest, and is narrowly tailored to serve that interest.

*Id.* at 222, 109 S.Ct. at 1019 (citations omitted).

The Eighth Circuit has explicitly recognized the apparent conflict between the standards set forth in *Takushi* and *Eu.* In considering the constitutionality of state primary election regulations, the Eighth Circuit examined the tests in *Takushi* and *Eu* and explained "[b]ecause of the factual and analytic similarity between *Takushi* and *Eu,* we cannot resolve their apparently inconsistent standards of review...." *Republican Party of Arkansas v. Faulkner County,* 49 F.3d 1289, 1297 (8th Cir.1995). The Eighth Circuit did not indicate which test should apply, but concluded:

> "[i]n any event, we need not attempt a definitive resolution of this problem in this case ... the burdens imposed by the combined effect [of the challenged election laws] upon the First and Fourteenth Amendment rights of voters ... convinces us that we must apply strict scrutiny under even the more flexible, sliding-scale standard of review articulated in [*Takushi*]."

*Id.* at 1297. As in *Republican Party,* Court finds that it need not resolve which standard of review applies to Chapter 372. As set forth below, the Court finds the Plaintiffs have failed to show they are likely to succeed on the merits of their claim under either standard.

#### 2. Application

Although the Plaintiffs allege a variety of constitutional violations in their Complaint, they focus on their challenge to the constitutionality of Chapter 372 and its application in the present Motion. Plaintiffs claim Chapter 372 is unconstitutional because (a) it requires each signatory to attest he or she "request[s] that the county seat be changed to" specific location rather than simply requesting the county seat be changed, (b) the 60–percent, 60–day requirements are overly burdensome, (c) the city designation, signature, 60–day, 60–percent and other provisions cumulatively impose an unconstitutional burden even if they individually do not, and (d) Chapter 372 was unconstitutionally applied.

##### i. Facial Challenge to Chapter 372

 Plaintiffs have not demonstrated they are likely to succeed on the merits of their facial challenge to Chapter 372. First, as set forth above, the state is not required to permit a vote on whether to move the county seat. The Plaintiffs accordingly have

no fundamental right to select their county seat. Thus to the extent the requirements imposed by Chapter 372 implicate constitutional concerns, they do so only insofar as they inhibit free speech or other constitutional rights *independent of the referendum.* With respect to Plaintiffs' challenge to the requirement petitioners sign the petition and state the city to which they request the county seat be moved, the Plaintiffs have failed to demonstrate how this independently restricts free speech or otherwise violates the Constitution. Indeed, the cases cited by the Plaintiffs on this issue relate exclusively to restrictions which required petition signatories to place candidates or political parties on general election ballots; none of the cases cited involves petitioning pursuant to a state-created procedure for a referendum unrelated to representative elections.

Moreover, even if the city designation and signature requirements incidentally burden constitutionally protected rights, these conditions appear narrowly tailored to serve a compelling government interest. Although not a party in this matter, the Attorney General for the State of Minnesota provided the Court with a synopsis of the legislative history behind the requirements established in Chapter 372. In it he explains:

> The [county seat referendum] process is no doubt difficult. Indeed, it is not intended to be particularly easy. At the time of statehood, Minnesotans recognized the evil inherent in the practice of the territorial legislature of constantly changing county seats at the solicitation of influential persons. They, therefore, acted to restrain that practice by including a constitutional requirement of *both* legislative action and a vote of the people in order to accomplish removal of a county seat. (emphasis added). *See State of Minnesota,* [*Roos v. State*] 6 Minn. 428 (Gil. 291) (1861). Minn. Const. 1857, art. XI, § 1. As originally adopted, the Constitution did not permit an election of county seat removal upon citizen petition, but required a special act of the legislature. *Roos.* The current version is contained in Minn. Const. art. XII,

§ 3.[14] Plainly, as our constitutional framers recognized, the change of an established county seat is a matter of such importance that it ought to require extraordinary caution and a high level of public support to be accomplished.

(Doc. No. 84.) As this passage reflects, Minnesota has a bona-fide, longstanding and apparently compelling interest in insuring stability in the structure of its political subdivisions, preventing frequent or ill-conceived movements of county seats and insulating control over such issues from the transitory whims of oscillating popular demand. Additionally, Minnesota has a compelling interest in ensuring there is adequate support for moving a county seat prior to expending public funds and efforts to administer an election. Finally, Minnesota has a compelling interest in requiring petition signatories to identify themselves in order to protect the integrity of the petition, to prevent fraudulent petitions and to verify that a special election is in fact warranted.

The city designation and signature requirements of Chapter 372 appear to be narrowly tailored to serve these same interests. Requiring the petitioners to designate the city to which they desire the county seat be moved does not require the petitioner to "vote" for such city in the election; it merely seeks to assure that a sufficient number of voters in fact desire such a move, together with its incidental costs, before an election is implemented. Similarly, the Plaintiffs have provided no alternative mechanism whereby the requisite number of voters favoring the proposed move could be determined without requiring these supporters to clearly identify themselves by signing the petition. The identity of the signer is, in this respect, crucial. Indeed, requiring supporters' signatures is inherent in the very nature of a petition. Consequently, the Plaintiffs have failed to carry their burden in showing they are likely to succeed on the merits of proving the city designation and signature requirements are unconstitutional.

**14.** Minn. Const. art. 12, § 3 provides in part "[a] county boundary may not be changed or county seat transferred until approved in each county affected by a majority of the voters voting on the question."

■ Similarly, the Plaintiffs have failed to demonstrate Chapter 372's 60–day, 60–percent requirements are unconstitutional. Because the Plaintiffs do not have a constitutional right in moving the county seat, the fact that the state requires a "super-majority" be obtained within sixty days is by itself irrelevant, even if it makes obtaining a successful vote extraordinarily difficult to obtain. So long as the State does not impinge upon its citizens' constitutional rights, it is free to make its citizens' ability to move their county seats as difficult or easy as it deems appropriate. For example, in upholding a state "super majority" referendum requirement, the Second Circuit explained:

> The fact that the provision makes it more difficult ... than would be the case if only a simple majority were required is constitutionally irrelevant.... [t]here is no constitutional necessity that the town provide a referendum vote at all. Therefore, we can find no constitutional infirmity when, having provided for a referendum, the town conditions it in a nondiscriminatory manner.

*Gray v. Town of Darien,* 927 F.2d 69, 72 (2nd Cir.), *cert. denied,* 502 U.S. 856, 112 S.Ct. 170, 116 L.Ed.2d 133 (1991); *see also Gordon v. Lance,* 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971) (noting that "there is nothing in the language of the Constitution, our history, or our cases that requires that a majority always prevail on every issue" and holding the state's 60–percent referendum vote requirement constitutional). The Court finds Plaintiffs have failed to show the 60–percent, 60–day requirements burden consti-

tutionally protected rights.[15] Accordingly, it need not subject these requirements to further scrutiny.

■ Moreover, because Plaintiffs have failed to show these requirements implicate constitutional rights, any "burdens" they may impose are not germane for the purpose of showing Chapter 372 is unconstitutional.[16] As a result, Plaintiffs have not demonstrated they are likely to succeed in proving Chapter 372's purported "cumulative" burdens make it facially unconstitutional.

Finally, the Court notes that Plaintiffs' contention regarding the purportedly insurmountable burdens imposed by Chapter 372 are discounted by the history of this Chapter. At least five Minnesota counties have successfully satisfied these requirements or their substantial equivalent and obtained a special election. *See* Minn.St.Bar Ass'n, *The First Hundred Years* (1983) at 68, 155, 174, 198, 203. Two of these county seats were successfully relocated as a result of this process.

### ii. Application of Chapter 372

■ In addition to challenging the express terms of Chapter 372, Plaintiffs claim the Board unconstitutionally applied Chapter 372 and violated their due process rights by failing to announce rules in advance to govern its consideration of the petition, failing to impose a reasonable time limit on its consideration of the petition, failing to announce rules governing withdrawals, accepting withdrawals without objection, using "delay tactics," and personally interrogating petitioners.[17] Plaintiffs' claims are insufficient, on

---

15. Several other states impose substantially identical restrictions on their citizens' ability to move a county seat. *See* Neb.Rev.Stat. § 22–301; Nev. Rev.Stat. § 243.465; Wis.Stat. § 59.11, subd. 2.

16. The Plaintiffs also object to the fact that "the statute places no time limit on a county board's consideration of a petition, fails to require advance notice of governing rules, forbids submission of additional signatures, and does not explicitly forbid withdrawals after submission" and claim that these requirements impose cumulatively unconstitutional burdens. (Pls.' Mem. in Supp. of Mot. at 28.) As discussed, the state may impose any nondiscriminatory procedural restriction it deems appropriate in the petition process, and, so long as it complies with other constitutional requirements, the fact that these

requirements may "burden" a petitioner's ability to obtain a special election is irrelevant.

17. Plaintiffs object to the Board's decision to "release" the names on the petition to the public. In considering this argument in Plaintiffs' state court action, the Minnesota Court of Appeals explained:

> While chapter 372 establishes detailed procedures to be followed in seeking to change a county seat, it neither states nor implies that *petitions submitted to the county auditor are inaccessible to the public. See* Minn.Stat. §§ 372.01–13. The County auditor must give notice "that a petition is on file" in the auditor's office. Minn.Stat. §§ 372.01–02. All documents on file with the county auditor or in

both the facts and the law, to satisfy this prong in the *Dataphase* analysis.

Plaintiffs have failed to identify a constitutionally protected right which has been violated by the application of Chapter 372. Under section 372.03, the Board was required to "inquire and determine" if (1) "any of the petition signatures are not genuine"; (2) "the signers were not, at the time of signing legal voters of the county"; (3) "the signatures were not attached within 60 days before the filing"; and (4) "any of the signatures had been withdrawn." Minn.Stat. § 372.03. Chapter 372 further obligated the Board to receive "[a]ny competent evidence" bearing upon this inquiry. *Id.* The Board was not obligated to exclude withdrawals, establish rules in advance, complete its deliberations within a specified period, or, as opposed to the petition signatures, insure the withdrawals were genuine. The fact that the failure to perform these functions allegedly hindered the Plaintiffs' ability to obtain a special election does not constitute a constitutional deprivation; as set forth above, the Plaintiffs have failed to show they have a constitutionally protected right in procedures not mandated by statute simply because such procedures would make the relief sought easier to obtain.

Moreover, the facts show that the Board diligently and responsibly conducted its review of the petition. The facts do not demonstrate the Board engaged in "unfair delay tactics." Section 372.01 specifically required the Board to wait at least fifteen days after submission of the petition to conduct deliberations. *See* Minn.Stat. § 372.01 ("[the] meeting of the county board to consider the petition . . . shall be . . . at least 15 but not more than 20 days after the filing [of the petition.]") The Board began its meeting eighteen days after the petition was filed and met twelve of the next sixteen business days. (Moren Aff. ¶ 8.) Similarly, the facts thus far presented do not show the Board accepted the withdrawals without inspection. Instead, the uncontested facts demonstrate the Board established a committee which reviewed the withdrawals, and that the withdrawals were authenticated by a public notary. (*Id.* ¶ 15.) Additionally, however "unfair" it may appear to Plaintiffs, there simply is no constitutional requirement that the withdrawals and the petition's signatures be subjected to the same authenticity tests; this matter is committed to the Board's discretion. Finally, Plaintiffs have failed to show how the Board's failure to promulgate rules in advance of its deliberations violated their constitutional rights. The materials provided to the Court demonstrate the Plaintiffs, and their counsel, were intimately involved in, and agreed to, the rules by which the Board evaluated the petition signatures and withdrawals. (*See* Moren Aff., Exhs. B–E.)

Based on the foregoing, the Court finds the Plaintiffs have not demonstrated they are likely to succeed on the merits of their claims. This *Dataphase* factor therefore militates against issuing the requested injunction.

### D. The Public Interest

■ The final *Dataphase* factor considers the public interest in the issuance or denial of the requested injunction. Plaintiffs claim the public's interest "in a democratic election" will be undermined because, absent an injunction, "Plaintiffs will not . . . have a meaningful chance to persuade the Court that an election should be held . . . much less have a meaningful chance to vote." (Pls.' Mem. in Supp. of Mot. at 31.) Plaintiffs offer no explanation of these assertions, nor does the Court find them supported by the record.

the auditor's "official custody" are available for inspection by "any person" during office hours. Minn.Stat. § 382.16. This requirement is consistent with the statutory provision that data on individuals collected by governmental subdivisions are public, unless specifically classified by statute as private or confidential. Minn.Stat. § 13.03 subd. 1. *Taxpayers' Choice Volunteer Comm. v. Granitz,* 1995 WL 164527, C5–95–645 at 5 (Minn.Ct.App. April 7, 1995) attach. at Bullard Aff.Ex. 5. The

Court of Appeals accordingly denied Plaintiffs' request to enjoin the release of the petition names. The Court concurs with the Minnesota Court of Appeals' conclusion and finds further discussion of this claim unwarranted for the purposes of the present Motion. Plaintiffs, rather than seeking review of this decision in the Minnesota Supreme Court, dismissed their state court action and commenced the present litigation.

Indeed, these claims dramatically overstate the effect of the proposed injunction. The Plaintiffs' ability to initiate a petition and vote to move the County seat does not hinge upon whether construction begins on a new courthouse. To the contrary, as set forth in the preceding sections, the Plaintiffs may obtain an opportunity to vote to move the county seat if they succeed on the merits of their claims. The availability of this relief is not affected by the proposed injunction. Although the public unquestionably has a significant interest in the protection of First and Fourteenth Amendment rights, Plaintiffs have failed to show how those rights are infringed by not enjoining construction on a new courthouse.

Alternatively, there is clear public policy counseling against issuance of the requested injunction. The public manifestly has an interest in permitting the County Board, as the duly elected representatives of the County citizenry, to administer the expenditure of county funds and county property without judicial interference. Indeed, the Minnesota Legislature has specifically codified this interest. *See* Minn.Stat. § 375.18, subd. 1 ("[e]ach county board may have the care of the county property, and management of the county funds and business ... and make order concerning them *as it deems expedient*"); *id.,* subd. 2 (emphasis added); ("each county board may erect, furnish, and maintain a *suitable* courthouse") (emphasis added). Although the Plaintiffs object to the Board's administration of the petition process, with respect to the public's interest in the requested injunction—which is the sole focus of the Court's inquiry—the Board's decision to award construction contracts to build a new county courthouse is well within its statutory authority. The public interest is not served by interference with the exercise of that power. If the Plaintiffs are dissatisfied with the Board's decision to build a new courthouse, the forum for their complaints is the next Board election, not federal court.

*E. Summary*

The Plaintiffs have failed to demonstrate an injunction is warranted in this case. They have not demonstrated they are likely to suffer irreparable harm in the absence of the requested injunction, they have not demonstrated the harm they may suffer is greater than the harm caused by issuing the injunction, and they have not demonstrated the injunction serves the public interest. The Court agrees with the three courts which have previously declined to interfere with the Board's decisions in this matter and will deny the Plaintiffs' Motion.

**Conclusion**

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. No. 13) is **DENIED.**[18]

18. The foregoing Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.